SECOND DIVISION
December 15, 2009

No. 1-08-2388

| | | |
|---|---|---|
| In re the MARRIAGE OF MEETA BHATI, | ) | Appeal from the |
| Petitioner-Appellant, | ) | Circuit Court of |
| | ) | Cook County |
| and | ) | |
| | ) | |
| AJAY SINGH, | ) | No. 03 D 10890 |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | Honorable Mark J. Lopez, |
| | ) | Judge Presiding. |

JUSTICE KARNEZIS delivered the opinion of the court:

Petitioner Meeta Bhati appeals from an order of the circuit court in favor of respondent Ajay Singh, denying her petition for removal of the parties' minor child, Sonia, to North Carolina, pursuant to section 609(a) of the Illinois Marriage and Dissolution of Marriage Act (720 ILCS 5/609(a) (West 2006)) (Act).

BACKGROUND

The following facts were taken from the testimony at the hearing on the removal petition, which occurred in the summer of 2008, as well as from the record on appeal. The parties, who are both of Indian descent, were married in 1995 in India. Ajay was living in the Chicago area at the time of the marriage and Meeta moved from India to Chicago after the wedding. They purchased a two bedroom townhome in Schaumburg, in which they resided, and Sonia was born in October 2001. Meeta discontinued

working when Sonia was born and became a stay-at-home mother. Ajay worked for United Airlines, as he continues to do to this day, and currently receives a yearly salary of approximately $400,000. In October 2003, Meeta filed for divorce and the parties entered into a joint parenting agreement in May 2004. The judgment for dissolution of marriage was entered in July 2005. Meeta currently works for RSM McGladrey and earns a yearly salary of approximately $60,000. Meeta and Sonia reside in the townhome and Ajay resides in the nearby suburb of Arlington Heights. Ajay remarried in December 2006. Sonia primarily resides with Meeta, but resides with Ajay every other weekend from Thursday night to Monday morning and every other Wednesday night to Thursday morning. The parties alternate holidays and Ajay has three weeks of vacation time with Sonia during the summer. Sonia attends Schaumburg Christian School and just completed first grade. She attends daycare during the day when she is not at school. The daycare is located only a few minutes from Meeta's home. During the school year, Meeta takes Sonia to school, which starts at 8 a.m., and is located about 20 to 25 minutes from their home. When school ends about 2:45 p.m., Sonia takes a school bus to her daycare until Meeta picks her up between 5:30 and 6:30 p.m. During the summer, Meeta brings Sonia to daycare between 8 and 8:30 a.m. and picks her up between 5:30 and 6:30 p.m. When Sonia resides with Ajay, he or his wife brings Sonia to school or daycare or picks her up from school or daycare. The parties' numerous e-mails in the record indicate that they often disagree as to when Sonia should be picked up and dropped off, at the times when the exchange does not occur

at school or daycare.

Meeta testified at the hearing that when she picks up Sonia from daycare, they come home, make dinner, do homework and then go to bed. She stated that this schedule does not allow Sonia much time for extracurricular activities or playdates with friends, although Sonia is enrolled in a dance class that meets on Tuesday evenings. Meeta noted that Sonia does have several friends at school, but does not have playdates with them. However, Sonia does sometimes have playdates with her friends from daycare. Meeta stated that Sonia does not have any friends in their neighborhood because it consists mainly of townhomes where there are not any children her age. Meeta also stated that the townhome only has a small patio and a very small yard, which does not have much space for Sonia to play.

Meeta testified that since her divorce, she has felt like a "pariah" or social outcast in the community. She noted that a single mother in Indian culture is ostracized and not given much respect. As a single mother, Meeta receives few social invitations and primarily socializes with other single mothers. Meeta is currently engaged to Dr. Viren Desai, who is also of Indian descent. They met through an Indian social networking website that brings people of Indian descent together for the purpose of marriage. She and Dr. Desai first began communicating with one another in April 2006 and met in person in May and became engaged that October. Dr. Desai is a physician who resides in Fayetteville, North Carolina. He is also divorced and shares custody of his two children who live nearby.

Meeta stated that if the court granted her petition for removal, she would not work and would be a stay-at-home mother to Sonia. Meeta and Sonia travel about once a month to visit Dr. Desai in North Carolina and Sonia has become very close to his daughter, Bianca, who is about two years older than her. Dr. Desai travels to Schaumburg to visit Meeta and Sonia about once a month as well. The plane ride from Chicago to Raleigh-Durham, North Carolina, is about 1 hour and 45 minutes long, and then the drive to Fayetteville is about 1 hour long. Meeta described Dr. Desai's home as a large, four bedroom, four bathroom home with a big backyard, swimming pool and swing sets, located in a gated community of single family homes. Sonia would attend Fayetteville Academy, a private school close to Dr. Desai's home, and where his two children also attend. The school includes grades from kindergarten to twelfth grade and offers many after school programs and sporting activities. Dr. Desai's office is also located close to his home. He is a member of the country club in Fayetteville, which has a golf course, tennis courts, swimming pool and dining facility. Dr. Desai has a large family, which gets together frequently to celebrate various holidays and birthdays. Meeta and Sonia have been welcomed into his family. Dr. Desai is also a member of various Indian organizations in Fayetteville and Raleigh-Durham that often host social gatherings.

Meeta testified that if she and Sonia were permitted to move to North Carolina, they would be able to spend more time together because Sonia would not need to be in daycare and Sonia would have more time for extracurricular activities and more of an

4

opportunity to play with children from her school and the neighborhood. Meeta also stated that Sonia will be able to observe Meeta in her new role as a married woman, which Meeta thinks is important for Sonia. Meeta stated that Sonia and Bianca already consider each other stepsisters and love one another.

Meeta further stated that to minimize the disruption of moving, she would ensure that Sonia was available to visit with Ajay either in Chicago or in North Carolina as much as possible. Meeta has a cellular telephone and a web camera that Ajay and Sonia can use to communicate. Meeta stated that she would keep Ajay informed about Sonia's school and her extracurricular activities. She also proposed that Sonia could visit Ajay during her spring break, half her summer vacation and they could alternate holidays as they currently do. Meeta denied threatening Ajay in any way if he did not agree to the move to North Carolina.

On cross-examination, Meeta admitted that she enrolled Sonia in Schaumburg Christian School for first grade without first informing Ajay because she and Ajay could not agree which school Sonia should attend. She further admitted that she enrolled Sonia in Fayetteville Academy without first discussing it with Ajay only so that the school could hold a spot open for Sonia in case the court granted the removal petition.

Ajay testified at the hearing that he is employed at United Airlines and is vice president of corporate real estate. As a benefit of his employment, he and his family members, including Sonia, travel free on United Airlines. He noted that although he does not pay for the tickets, there are tax implications. He resides in Arlington Heights

5

with his wife Kendra and her son Jake, who is 15-years old. They have been living together since the fall of 2005. He stated that Jake and Sonia have a great relationship and refer to each other as brother and sister, and that Kendra and Sonia have a great relationship. Ajay stated that he had agreed to let Sonia attend Schaumburg Christian School for kindergarten, but that for first grade he wanted Sonia to attend a Catholic school in Arlington Heights. He stated that the Christian school was run by a Baptist church and he felt it was too strict. Ajay stated that while they were discussing the issue, Meeta went ahead and enrolled her in the Christian School and told him about it later. He stated that in the summer of 2006, he had trouble contacting Meeta and Sonia on the telephone and had to file a motion with the court, which resolved the conflict. He stated that around September 2006, Sonia told him about moving to North Carolina, which "completely shocked" him because Meeta had never said anything to him about it. As a result, he and Meeta agreed to meet at Starbuck's to discuss the situation. Ajay claimed that Meeta gave him 24 hours to decide if he would agree to removal and that if he did not agree, she would file a petition in court. Ajay further claimed that Meeta told him that she and Dr. Desai would make his life a "living hell" in that they would file lawsuits against him, they would send letters to his boss, and would make his life a difficult financial hardship if he did not agree. Ajay stated that anonymous letters were written to the CEO and CFO of United Airlines as well as the head of human resources concerning him and accusing him of things he never did.

Ajay testified as to his difficulty with Meeta in scheduling extra parenting time

with Sonia above and beyond what the joint parenting agreement provided. Ajay feared that if Meeta and Sonia move, Meeta will make it very difficult for him to see Sonia.

On cross-examination, Ajay admitted that his petition for enforcement of visitation and visitation abuse did not mention anything about not being able to talk with Sonia on the telephone. He also admitted that he did not exercise his three weeks vacation with Sonia in the summer of 2006, but partly did in the summer of 2005 and 2004. He further admitted that he did not tell Meeta he had gotten engaged to Kendra until months later and did not recall whether he told Meeta or Sonia first about the engagement. Ajay stated that he travels once or twice a month out of town for business, but the majority of the trips are day trips. He admitted that when he has traveled out of town, he has asked to switch parenting days with Meeta, but that it only happened in 2005 and 2006.

Dr. Viren Desai testified that he is an interventional pain management specialist, which means that he treats people's pain symptoms. His son, Kochan, is 17 years-old and just recently moved in with him. His daughter, Bianca, is 10 years-old and lives with him every other weekend, half the summer, and on an alternating holiday schedule. Fayetteville Academy is located about a mile from his home and is a non-denominational school, with a good reputation for academics and has about 12-16 children per class. He stated that Sonia will have her own room in his home, but she told him that she and Bianca want to share a room. Dr. Desai described Sonia and Bianca's relationship as loving and caring. He further stated that he will support any

7

visitation schedule "110%." On cross-examination, Dr. Desai denied threatening Ajay at the Starbuck's meeting.

Meena Desai, who is one of Dr. Desai's sisters, testified that they frequently get together for family dinners, about 20-25 times a year. She also stated that the Indian communities in Raleigh and Fayetteville have a lot of social activities in which they participate. Meena stated that Dr. Desai and Sonia have a loving relationship and she sees Sonia hugging Dr. Desai and sitting on his lap. She also acknowledged the close bond between Sonia and Bianca and noted that they play together and that Sonia wants to do everything Bianca does. Meena further stated that as a married Indian woman, Meeta would have better status within her community and command more respect.

Zahra Tashakkori testified that she works for Dr. Desai and is his neighbor. She has witnessed the relationship between Sonia and Bianca and described them like twins. She stated that Bianca is a role model for Sonia. She further stated that Dr. Desai and Sonia have a very positive relationship and noted that Sonia will cuddle with him on the sofa and fall asleep. Additionally, she knows that Sonia plays with the other children in the neighborhood.

Dr. Leslie Star testified that she is a clinical psychologist and was appointed by the court to conduct an examination pursuant to section 604(b) of the Act. Specifically, she was to advise the court of the impact of the proposed removal, if any, on the emotional, psychological and physical health of Sonia and the impact, if any, on the

8

relationship between Sonia and Ajay. Dr. Star interviewed Ajay, Kendra, Meeta, Dr. Desai and Sonia and visited the parties' homes. She also spoke with Sonia's teacher and daycare provider. Dr. Star's report contains her observations and her "synopsis" of the interviews, which are summaries of her conversations and interactions with those she interviewed. The report was entered into evidence at the hearing. Most notably, the report discussed the concept of "protective factors," which were described as "the residential parent's sincere commitment to the involvement of the other parent, evident in frequent sharing of information, business-like and effective communication about the child, flexibility about time and working with the other parents whenever appropriate." Dr. Star concluded that in this case, protective measures "do not seem evident." Specifically, her report stated "[w]hile [Meeta] has allowed [Ajay] his parenting time without difficulty, she does not inspire confidence due to her apparent attempts to coach the child, her quasi-negative remarks about [Ajay] to Sonia, her exclusionary policy regarding decisions about Sonia's school, activities and medical matters and her willingness to manipulate situations to her advantage in an attempt to make [Ajay] look bad." The report concluded that "[t]he overall effects point to a potentially negative outcome to Sonia's adjustment and development immediately and in the future and a high risk for damage to her relationship with [Ajay]."

## ANALYSIS

On appeal, Meeta first contends that the circuit court's order denying her petition for removal was against the manifest weight of the evidence. She argues that removal

to North Carolina would be in Sonia's best interest.

Section 609(a) of the Act provides:

"[t]he court may grant leave, before or after judgment, to any party having custody of any minor child or children to remove such child or children from Illinois whenever such approval is in the best interests of such child or children. The burden of proving that such removal is in the best interests of such child or children is on the party seeking the removal. When such removal is permitted, the court may require the party removing such child or children from Illinois to give reasonable security guaranteeing the return of such children." 750 ILCS 5/609(a) (West 2006).

In deciding whether removal is in the child's best interest, a trial court should hear any and all relevant evidence. In re Marriage of Eckert, 119 Ill. 2d 316, 326 (1988). A determination of the best interests of the child cannot be reduced to a simple bright-line test, but rather must be made on a case-by-case basis. Eckert, 119 Ill. 2d at 326. Illinois courts consider numerous factors to determine the child's best interests. These factors are: (1) the likelihood that the proposed move will enhance the general quality of life for both the custodial parent and the children; (2) the motives of the custodial parent in seeking the move; (3) the motives of the noncustodial parent in resisting the removal; (4) the effect on the non-custodial parent's visitation rights; and (5) whether a realistic and reasonable visitation schedule can be reached if removal is

permitted. Eckert, 119 Ill. 2d at 327. None of these factors is controlling and the weight to be accorded each factor will vary depending on the facts of the case. In re Marriage of Collingbourne, 204 Ill. 2d 498, 523 (2003).

A trial court's determination should not be reversed unless it is against the manifest weight of the evidence and it appears that a manifest injustice has occurred. Eckert, 119 Ill. 2d at 328. A decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence. In re Marriage of Matchen, 372 Ill. App. 3d 937, 946 (2007).

The circuit court's written order analyzed each of the Eckert factors. Considering the first factor, the likelihood for enhancing the general quality of life for the custodial parent and the child, the court found that this factor weighed in favor of removal. The court noted that if Meeta and Sonia moved to North Carolina, and Meeta married Dr. Desai, Meeta would be a stay-at home mother, which would eliminate the need for daycare for Sonia. The court also noted as a benefit the house and community in which Meeta and Sonia would live as well as the private school that Sonia would attend. The court further acknowledged Sonia's close relationship with Dr. Desai's two children, especially his daughter Bianca, who is close in age to Sonia.

Considering the second factor, the motives of the custodial parent in seeking the move, the court found that Meeta's motives were both genuine and insincere. The court found Meeta's motives genuine when considered in the context of the economic

11

improvements to Meeta and Sonia's lives, the improvements to Meeta's social standing in marrying a doctor, and the greater involvement of both Meeta and Sonia in Dr. Desai's family gatherings and the Hindu community in the Fayetteville area. However, the court found Meeta's motives insincere in that she had "failed to embrace the spirit" of the joint parenting agreement and left the court with the impression that she would be pleased if she did not have to interact with Ajay as frequently as she was obligated to do. The court further found that in this respect, Meeta's motives were intended to frustrate Ajay's visitation.

Considering the third factor, the motives of the noncustodial parent in resisting removal, the court found "without question that Ajay's motives in objecting to the removal [were] genuine." The court noted that Ajay had exercised his weekly parenting time with Sonia on a regular basis since the entry of the joint parenting agreement. The court also noted that Sonia slept at Ajay's home five nights out of every fourteen days and Ajay involved himself with Sonia's school, her extracurricular activities, and her doctor's appointments. The court further found that Sonia had a close, loving relationship with Ajay and his wife Kendra and her son Jake and that they had lived together as a family since the fall of 2005. The court stated that Ajay and his other family members were "completely invested" in Sonia's emotional well being and that Sonia was emotionally invested with Ajay and his family.

Considering the fourth factor, the effect on the non-custodial parent's visitation rights, the court did not specifically comment on "the effect" removal would have on

12

Ajay's visitation rights. Instead, the court analyzed this factor in terms of "[t]he visitation rights of the non-custodial parent should be carefully considered," finding that Ajay had been "diligent in exercising all the parenting time afforded him in the parties' joint parenting agreement and routinely seeks additional time with Sonia."

Considering the fifth factor, whether a realistic and reasonable visitation schedule could be reached if removal is allowed, the court found that a reasonable visitation schedule could not be reached. The court noted the lack of cost to Ajay of flying to North Carolina as a benefit of his employment, but also stated that this factor became irrelevant when the court considered the lack of "protective factors" as described by Dr. Star. The court criticized many of Meeta's parenting actions including: failing to tell Ajay she desired to move to North Carolina with Sonia and letting Sonia advise Ajay of the proposed move; failing to tell Ajay she was bringing Dr. Desai to the Starbuck's meeting to discuss the proposed move and thereafter giving Ajay 24 hours to decide about the move; coaching Sonia by telling her what to say to Dr. Star; telling Dr. Star that there was domestic violence between the parties when there was no credible evidence in the record to support that allegation; misrepresenting to Dr. Desai that Ajay had no involvement in Sonia's life for the last five years; enrolling Sonia in Schaumburg Christian Academy and failing to advise Ajay until after the enrollment was completed; and enrolling Sonia in extracurricular activities without advising Ajay in violation of the joint parenting agreement.

The circuit court further concluded that removal would substantially impair Ajay's

parenting time with Sonia and the loss of regular and ongoing parenting time between Sonia and Ajay and his family members would be detrimental to Sonia's emotional well being and "too high a price to allow removal." The court also found that the quality of time allowed Ajay and Sonia would be substantially less than the quality that they enjoyed under the current visitation schedule.

We now examine whether the circuit court's determination regarding removal was against the manifest weight of the evidence. First, we examine the court's findings regarding the likelihood that the proposed move will enhance the general quality of life for both Meeta and Sonia. The record support's the court's finding that this factor weighs in favor of removal. The move will provide a major advantage in that as a stay-at home mother, Meeta and Sonia will be able to spend a significant quantity of time together before and after school instead of Sonia spending that time in daycare as she currently does in Illinois. Sonia will also be able to attend a school just minutes from her home and will be able to schedule play dates with friends after school and generally take advantage of activities offered after school that she could not have otherwise engaged in when going to daycare. Sonia would also benefit from living in a family oriented community composed mainly of single family homes and the large home in which Dr. Desai resides includes a large yard and swimming pool. Sonia would also have the benefit of residing part-time with Dr. Desai's children, with whom she has spent a considerable amount of time and with whom she has established a close relationship.

14

Second, we examine Meeta's motives in seeking the move. We find support for the court's finding that Meeta's motives are "genuine," but do not find support for its finding that her motives are at the same time "insincere." Meeta's motives in seeking the move are genuine in that she is engaged to Dr. Desai, who has welcomed Meeta and Sonia into his home and family, and who has developed a loving and caring relationship with Sonia. Meeta's motives are also genuine in that Sonia's quality of life will improve when considered in the context of being able to spend more time with Meeta at home rather than in daycare and living close to the school that she will attend and living in a neighborhood that is mainly composed of families with children. This factor weighs in favor of removal.

We do not find support for the court's finding that Meeta's motives are insincere because she has failed to "embrace the spirit" of the joint parenting agreement and she is seeking to frustrate Ajay's visitation. We note that the record indicates that Ajay and Meeta had numerous disagreements, including which school Sonia should attend, which extracurricular activities Sonia should be enrolled in and which movies Sonia should see. We view these as disagreements that most parents have, whether married or divorced. Meeta has abided by the visitation scheduled and has not interfered with Ajay's visitation with Sonia. It is clear that Ajay and Meeta often disagree regarding additional parenting time over and above the regular visitation schedule, however, this does not mean that Meeta has tried to frustrate Ajay's visitation. Further, the court's finding that it was left with the "impression" that Meeta would prefer not to have to

interact with Ajay as much as she is obligated to do is one-sided. The testimony at the hearing established that Ajay and Meeta do not frequently interact with one another in person and the majority of their transfers of Sonia's custody occur at Sonia's school or daycare. It appears that Ajay and Meeta both wish to limit their mutual interactions.

Third, we examine Ajay's motives in resisting removal. We find support for the court's finding that Ajay's motives in resisting removal are "genuine," that he loves and cares for Sonia very much and that he has provided Sonia with a loving home. This factor weighs against removal.

Fourth, we examine the effect of removal on Ajay's visitation rights. We note that the court did not specifically comment on the "effect" removal would have on Ajay's visitation rights; it only noted his diligence in exercising his visitation rights with Sonia. The record indicates that if removal were allowed, Ajay's visitation time with Sonia would be diminished as a result of the distance between Illinois and North Carolina. However, the record also indicates that both Ajay and Sonia could fly for free to visit one another and the visits would not be financially burdensome. This factor, for the most part, weighs against removal.

Fifth, we examine whether a realistic and reasonable visitation schedule can be reached if removal is permitted. We do not find support for the court's finding that a reasonable visitation schedule could not be achieved. The testimony at the hearing indicated that Ajay would be able and willing to travel to North Carolina to visit Sonia and Sonia would be able to travel to Illinois to visit Ajay and his family. The parties

would need to schedule visitation around Sonia's school calendar, however, there is no support for the finding that a realistic and reasonable schedule could not be established. We note that the court found that any proposed schedule would substantially impair Ajay's parenting time with Sonia; however, the consideration is whether a realistic and reasonable schedule can be reached. This factor weighs in favor of removal.

Here, we are presented with a situation in which some of the Eckert factors weigh in favor of as well as against removal. As stated above, no one factor is controlling and a determination of the best interests of the child must be made on a case by case basis. In this case, we find three of the factors in Meeta's favor, namely, that removal would enhance the quality of life for both Meeta and Sonia, Meeta's motives in seeking removal are genuine and a reasonable visitation schedule could be established. The remaining two factors in Ajay's favor, that his motives for resisting removal are genuine and that his visitation with Sonia would be diminished, do not outweigh the other factors. This determination should not be interpreted to mean that removal is in Sonia's best interests because there were three factors in Meeta's favor and only two factors in Ajay's favor. Rather, it is the nature of those factors in Meeta's favor that lead to the determination that removal is in Sonia's best interests. The fact that the move will enhance the quality of life for Meeta and Sonia, that Meeta is seeking to move to marry Dr. Desai and that a reasonable visitation schedule could be established, weigh heavily in our determination that in this case, removal would be in

Sonia's best interests. We find the court's determination that removal was not in Sonia's best interests to be against the manifest weight of the evidence. A review of the record leads to the conclusion that in this case, the opposite conclusion is clearly evident.

We note that a child is neither a chattel that can be split between two owners nor an object in which any one person can hold a possessory interest. When drafting the removal statute the legislature provided that the best interests of the child were paramount. If removal results in an enhanced quality of life for Meeta and Sonia, then the fact that Ajay's visitation with Sonia would be diminished, should not overcome the other benefits to Sonia, which the court noted were numerous. We conclude that removal to North Carolina is in Sonia's best interests and the court's findings denying removal are against the manifest weight of the evidence. Meeta has met her burden of establishing that the petition for removal should be granted.

Motion to Strike Closing Statement

Next, Meeta contends that the circuit court's order denying her motion to strike child representative Jean Conde's closing statement was a violation of section 506(a)(3) (750 ILCS 5/506(a)(3) (West 2006)) of the Act. In April 2007, Jean Conde was appointed as a child representative pursuant to section 506(a)(3) of the Act. At the hearing, after the conclusion of the parties' closing statements, the court permitted Conde to address the court. Conde asked the court to deny the removal petition. Subsequently, after the hearing, Meeta moved to strike the entirety of Conde's closing

statement.  The court denied the motion, finding that "[t]he entire argument was evidence-based legal argument."  However, the court did strike the last sentence of Conde's statement, which was "[a]nd I have to ask you on Sonia's behalf because she doesn't have a voice here today, she asks me, to deny the removal."

Section 506(a)(3) provides in part:

"[t]he child representative shall advocate what the child representative finds to be in the best interests of the child after reviewing the facts and circumstances of the case.

\* \* \*

The child representative shall not render an opinion, recommendation, or report to the court and shall not be called as a witness, but shall offer evidence-based legal arguments.  The child representative shall disclose the position as to what the child representative intends to advocate in a pre-trial memorandum that shall be served upon all counsel of record prior to the trial."  750 ILCS 5/506(a)(3) (West 2006).

Initially, we note that Meeta's counsel did not object to any of Conde's closing argument.  Instead, the motion to strike was brought about a week after the hearing.

Meeta contends that Conde's entire closing argument should have been stricken. Meeta argues that Conde's argument violated section 506(a)(3) because it consisted of opinions and recommendations, instead of evidence-based legal arguments. Specifically, Meeta points to Conde's statements regarding the difficulty of a reasonable

19

visitation schedule that will allow Ajay the same kind of contact with Sonia that he currently has. Meeta argues that Conde's statements were prejudicial because ultimately one of the reasons that the court denied removal was based on the difficulty of establishing a reasonable visitation schedule. Meeta also points to Conde's statements that "the law" requires the court to be "hard on removal." Meeta further noted Conde's statements that Sonia was "probably happy as a clam" in daycare and that "if we start pawning her back and forth, she's not going to be on the soccer team - - or not be as active on the soccer team." Meeta argues that these statements were not based on evidence in the record because there was no testimony regarding Sonia's activities at daycare and no testimony that Sonia even desired to be on a soccer team.

Here, Conde's last statement asking the court to deny removal, which the court struck, was clearly improper pursuant to section 506(a)(3), which prohibits the child representative from rendering an opinion or recommendation. However, the rest of Conde's closing argument was proper. Regarding a possible visitation schedule, the record contains numerous references that neither party had proposed a visitation schedule and that visitation would require a plane ride and that Ajay's time with Sonia would be decreased because of the distance between Illinois and North Carolina. Therefore, we find Conde's statements regarding the difficulty of establishing a reasonable visitation schedule a fair inference from the testimony. Regarding Conde's statement that the court should be "hard on removal," we note that Meeta's attorney addressed the issue in his rebuttal that a court should not be "hard" or "soft" on

20

removal, rather, a court must follow the law. Further, regarding Conde's statements about daycare, the trial testimony indicated that Sonia was a well adjusted, happy child. There was no evidence that Sonia was anything but happy with her daycare. Moreover, the soccer team comment was an example of the lack of consistency that Sonia might have in solidifying friendships and relationships if she is frequently traveling between Illinois and North Carolina. We do not find any improprities with Conde's statements. Moreover, the circuit court did not refer to Conde's closing argument in its written order denying removal. Therefore, even if any of Conde's statements could be found to be inappropriate, we find no resulting prejudice.

Meeta relies on In re Marriage of Bates, 212 Ill. 2d 489 (2004) for support. However, Bates dealt with a prior version of section 506 in which the child representative was permitted to submit a sealed report in evidence, without any party permitted to cross-examine the representative. The supreme court found that although the parties were denied due process in failing to allow cross-examination of the child representative, there was no prejudice because all of the child representative's observations, recommendations and conclusions were supported by evidence in the record and the report did not play a significant role in the trial court's ruling. Bates, 212 Ill. 2d at 518. We find Bates distinguishable and it does not offer support for Meeta's contentions.

## Motion *In Limine*

Next, Meeta contends that the circuit court erred in denying her motion *in limine*

to bar Dr. Star's testimony. Meeta argues that Dr. Star should not have been permitted to testify because she was not an "expert" and her testimony was common knowledge.

Dr. Star was appointed by the court pursuant to section 604(b) of the Act. That section provides in part:

"[t]he court may seek the advice of professional personnel, whether or not employed by the court on a regular basis. The advice given shall be in writing and made available by the court to counsel. Counsel may examine, as a witness, any professional personnel consulted by the court, designated as a court's witness." 750 ILCS 5/604(b) (West 2006).

When the court denied the motion, it stated, "[s]he certainly can testify. A 604(b), (sic) she is a psychologist. She is a professional. It's a professional opinion. That is what I'm accepting it as. That is what 604(b) refers to." The court further noted that Dr. Star's report would provide some insight into Ajay and Sonia's relationship, which was unique to the two of them. The court also denied Meeta's counsel's statement that Dr. Star would be "cloaked in an aura of almost irrefutable authority," and further stated that it would not forfeit its responsibility as the trier of fact and would not blindly accept Dr. Star's report. A trial court has discretion in granting a motion *in limine* and a reviewing court will not reverse a trial court's order allowing or excluding evidence unless that discretion was clearly abused. Beehn v. Eppard, 321 Ill. App. 3d 677, 680 (2001).

Here, we find no abuse of discretion when the court denied the motion *in limine*.

22

Section 604(b) clearly refers to "the advice of a professional personnel." It does not refer to or even intend to include "expert" opinions as Meeta argues. The court stated that it would use Dr. Star's report as it would any other evidence to help determine the ultimate issue of whether removal should be granted. We find no abuse of discretion.

Section 604.5 Evaluation

Lastly, Meeta contends that the circuit court erred in denying her motion for an evaluation pursuant to section 604.5 of the Act (750 ILCS 5/604.5 (West 2006)). Meeta argues that the evaluation was necessary because Dr. Star's report was adverse to her interests and another evaluation was necessary for her to rebut Dr. Star's report. She relies on In re Marriage of Cohen, 189 Ill. App. 3d 418 (1989). We review the denial of evidentiary motions for an abuse of discretion. In re Leona W., 228 Ill. 2d 439 (2008).

Section 604.5 provides in part:

"In a proceeding for custody, visitation, or removal of a child from Illinois, upon notice and motion made within a reasonable time before trial, the court may order an evaluation concerning the best interest of the child as it relates to custody, visitation, or removal." 750 ILCS 5/604.5 (West 2006).

The court denied the motion, finding that another evaluation would be burdensome, and also, because Meeta had coached Sonia before Sonia's interview with Dr. Star, it was not in Sonia's best interest to conduct another evaluation.

Here, we find no abuse of discretion. Dr. Star's report indicated that she

conducted extensive interviews with the parties and with Sonia and she set forth those findings in her report. As the court noted, Meeta had coached Sonia prior to Sonia's interview with Dr. Star. We fail to see any benefit to the parties in ordering another evaluation. Perhaps the report was not to Meeta's liking, however, this, by itself, was not sufficient to conduct an additional evaluation. Under these circumstances, we cannot find any abuse of discretion.

Additionally, we find Cohen distinguishable. In Cohen, the respondent requested an evaluation pursuant to Supreme Court Rule 215(a) (134 Ill. 2d R. 215(a)) to address allegations of sexual abuse. The allegations against the respondent resulted in the court awarding permanent custody of the parties' children to the petitioner and allowing removal of the children to another state with the petitioner. This court found on appeal that it was reversible error to deny the respondent an evaluation, and therefore, the opportunity to obtain an expert opinion on the validity of the sexual abuse allegations. Cohen, 189 Ill. App. 3d at 424.

Here, we have no allegations of abuse such that an additional evaluation would be necessary as in Cohen.

Accordingly, we reverse the judgment of the circuit court.

Reversed.

THEIS, J., concurs.

No. 1-08-2388

JUSTICE HOFFMAN, dissenting:

The majority has correctly set forth the standard of review in this case; namely, the manifest weight of the evidence. However, instead of according the trial court's decision the deference it is due (In re Marriage of Collingbourne, 204 Ill. 2d 498, 522 (2003)), the majority appears to have usurped the fact finding function of the trial court and decided this case de novo. As I believe that the trial court's well-reasoned order is not against the manifest weight of the evidence and should be affirmed, I dissent.

Section 609(a) of the Illinois Marriage and Dissolution of Marriage Act places the burden of proof in a case such as this on the party seeking removal to show that the move would be in the child's best interest. 750 ILCS 5/609(a) (West 2008); In re Marriage of Eckert, 119 Ill. 2d 316, 325 (1988). The trial court's determination of the child's best interest should not be disturbed on review unless it is "clearly against the manifest weight of the evidence." Eckert, 119 Ill. 2d at 328.

In Eckert, the supreme court suggested a number of factors which a trial court should consider in a removal proceeding to determine the best interests of the child. The trial judge in this case entered a 31-page written order in which he meticulously outlined all of the evidence going to each of the Eckert factors. The trial judge concluded that one of the Eckert factors weighed in favor of removal; namely, that the proposed move from the jurisdiction would enhance the general quality of life for both the petitioner, Meeta Bhati, and the minor child. However, the trial court found that the remaining factors weighed against removal.

The majority concedes that the trial court correctly determined that the respondent, Ajay Singh, has genuine motives in resisting removal. The majority also found that removal of the minor child from this jurisdiction will diminish the respondent's visitation time and that this factor weighs against removal.

As to the factors concerning the petitioner's motives in seeking the move and the question of whether a reasonable visitation schedule can be reached that will preserve and foster the minor child's relationship with the respondent, the majority takes issues with the trial court's findings. The trial court concluded that, although the petitioner's motives in seeking removal are genuine, they are insincere and intended to frustrate the respondent's visitation with the child. The trial court found that the petitioner has failed to embrace the spirit of the joint parenting agreement and that she would be pleased if she was no longer required to interact with the respondent with the frequency that she is now required to do. There is no question that there is evidence in the record of the petitioner's failure to consult the respondent in matters involving the education of the minor child and that the respondent had difficulty with the petitioner in scheduling extra visitation beyond that which the joint parenting agreement provided. Further, Dr. Star, the court appointed clinical psychologist, reported that the petitioner's sincere commitment to the respondent's involvement with the minor child did not seem evident. Contrary to the majority, I believe that there is evidence in the record which could support the conclusion that the petitioner's motives in seeking removal are not grounded in a concern for the best interests of the minor child and that this factor

26

weighs against removal.

In concluding that a reasonable visitation schedule could not be achieved in the event that the child were removed from the jurisdiction, the trial judge again relied upon Dr. Star's opinion that the petitioner does not appear to have a sincere commitment to the respondent's involvement with the child. The court noted that the petitioner never told the respondent of her intent to move to North Carolina; that she coached the child to tell Dr. Star that she wanted to move; that the petitioner told Dr. Star that the respondent had been physically abusive toward her when there was no credible evidence to support such a claim; that she told her fiancé, Dr. Desai, that the respondent had no involvement with the child for the past five years when the facts show that the respondent has always been involved in the child's life and that they have a warm and close relationship. Again, I believe that these facts could well support the trial court's finding that the petitioner has behaved in a manner indicative of an intent to frustrate the respondent's visitation with their child, and the court's conclusion that she would not work to achieve a reasonable visitation schedule.

Additionally, the majority mistakenly asserts that the trial court "did not specifically comment on the 'effect' removal would have on Ajay's visitation rights." To the contrary, paragraph 23 of its order states that: "The Court finds that removal with [sic] substantially impair Ajay's parenting time."

Most glaringly, however, is the majority's total failure to address the Eckert factor which I believe is of paramount concern in this case; namely, the potential harm to the

27

child which may result from the move due to impairment of the respondent's involvement with the child. See Eckert, 119 Ill. 2d at 328. After evaluating all of the evidence in this case, the trial court concluded that the loss of regular and ongoing visitation between the minor child and the respondent and his family members would be detrimental to the child's emotional well being.

The trial court specifically mentioned the Eckert factors and weighed each one. It is not this court's function to reweigh the evidence (In re Marriage of Smith, 172 Ill. 2d 312, 324-25 (1996)) or assess the credibility of the witnesses and set aside the trial court's determinations merely because a different conclusion could have been drawn from the evidence (In re Marriage of Pfeiffer, 237 Ill. App. 3d 510, 513 (1992)). This court's function is to determine whether the trial court's finding that removal of the child would not be in her best interests is against the manifest weight of the evidence. Eckert, 119 Ill. 2d at 328. In applying that standard of review, we are to accord deference to the trial court's determination and should be guided by a presumption in favor of the result reached by the trial court. Collingbourne, 204 Ill. 2d at 522.

Whether this court might have reached the same conclusion is not the test of whether the trial court's determination is against the manifest weight of the evidence. Rather, the appropriate test is whether there is sufficient evidence in the record to support the trial court's determination. In re Marriage of Matchen, 372 Ill. App. 3d 937, 946 (2007). I believe that there is, and, as a consequence, I would affirm.