NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 210020-U

NO. 4-21-0020

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 16, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| MICHAEL C., | ) | Appeal from the |
|     Petitioner-Appellee, | ) | Circuit Court of |
|     v. | ) | McLean County |
| AMBER B., | ) | No. 14F145 |
|     Respondent-Appellant. | ) | |
| | ) | Honorable |
| | ) | Charles M. Feeney III, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices DeArmond and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's judgment allowing removal of the minor child from Illinois and
awarding a majority of the parenting time and final decision-making authority to
the father was not against the manifest weight of the evidence.

¶ 2    Respondent, Amber B., appeals the McLean County circuit court's December
2020 order, which allowed petitioner, Michael C. to remove the parties' minor child, M.B.C.,
from Illinois and awarded petitioner a majority of the parenting time and final decision-making
authority. On appeal, respondent argues the circuit court's determinations were against the
manifest weight of the evidence. We affirm.

¶ 3                                      I. BACKGROUND

¶ 4                          A. Earlier Proceedings in This Case

¶ 5    The parties were never married, and M.B.C. was born in February 2014. Three
months after his birth, petitioner filed a petition for custody of M.B.C. In July 2014, the circuit

court entered a temporary visitation order, granting petitioner visitation on alternate Saturdays and every Tuesday and Thursday evening. The order stated neither parent was to have alcohol or drugs or be under the influence of alcohol or drugs when M.B.C. was in his or her care. In April 2015, the parties entered into a parenting agreement, under which they both would have joint legal custody of M.B.C. with respondent having primary residential custody and petitioner having liberal parenting time. However, the court never approved the agreement. In July 2015, the temporary visitation order was modified to provide petitioner with alternating weekend visitation instead of Saturday visitation.

¶ 6                                    B. State Involvement

¶ 7            In April 2016, petitioner filed a motion to terminate child support. In the motion, he alleged the State of Illinois took protective custody of M.B.C. on March 30, 2016. The temporary custody order in the juvenile case (In re M.C., No. 16-JA-25 (Cir. Ct. McLean County)) awarded temporary custody of M.B.C. to the Department of Children and Family Services (DCFS). In a June 2, 2016, docket order in this case, the court noted any child-related issues were to be heard by the judge in case No. 16-JA-25, if it was still open. Additionally, we note respondent had a second minor child, P.D. (born in 2008), who was also the subject of a juvenile case (In re P.D., No. 16-JA-26 (Cir. Ct. McLean County)). The two juvenile cases were consolidated. We note the record on appeal contains only the juvenile documents submitted by the parties during the proceedings in this case.

¶ 8            In the consolidated juvenile cases, the circuit court entered a September 22, 2016, dispositional order, which found petitioner fit but concluded respondent and P.D.'s father, Colin D., were unfit. M.B.C. had been allowed to reside with petitioner, and the permanency goal for M.B.C. was to remain home with petitioner. In a November 2016 order in this case, the court

allowed the termination of child support, noting the minor child currently resided with petitioner as a ward of the court in McLean County case No. 16-JA-25. On February 16, 2017, the court entered another permanency order in case No. 16-JA-25, finding petitioner fit, restoring legal custody and guardianship of M.B.C. to petitioner, releasing wardship, and closing the case.

¶ 9 In case No. 16-JA-26 (P.D.'s case), the circuit court entered a permanency order on June 21, 2017, finding respondent fit and changed the permanency goal to return home in five months. The order also noted it was in P.D.'s best interests to be transitioned home to respondent prior to the start of school in the fall. In the order, the court found Colin D. remained unfit. A September 20, 2017, docket entry in this case noted case No. 16-JA-26 was closed and any further child issues regarding M.B.C. were to be heard in this case.

¶ 10 C. Injunction Proceedings in This Case

¶ 11 In July 2017, respondent filed a petition for injunctive relief, asserting petitioner left the state with M.B.C. on March 17, 2017, and had since resided in Massachusetts. Respondent alleged petitioner did not file a notice of intent to relocate. She further noted that, on June 21, 2017, the circuit court had found her fit in the juvenile case. On June 23, 2017, she requested parenting time with M.B.C., and petitioner had not responded to her request. Respondent asked to have petitioner return M.B.C. to Illinois. Petitioner filed a motion to dismiss the petition for injunctive relief, noting he had custody of M.B.C. under an order in the juvenile case and respondent had not been found fit as to M.B.C. Respondent sought leave to file an amended petition for injunctive relief, noting no final order had been entered in this case and her parental rights to M.B.C. had not been terminated. The court granted her leave to file the amended petition. Petitioner filed a response to the amended petition for injunctive relief, which included a counterpetition that requested respondent's visitation be supervised and petitioner be

- 3 -

allowed to relocate the child to Massachusetts.  Respondent filed a motion to dismiss petitioner's counterpetition.  After a September 7, 2018, hearing, the circuit court dismissed petitioner's request for relocation of the child to Massachusetts because he failed to comply with the statutory notice requirement.

¶ 12       After a November 14, 2017, hearing on only respondent's amended petition for injunctive relief, the circuit court granted respondent's petition and ordered petitioner to return with M.B.C. to Illinois within 60 days.  In December 2017, petitioner filed a motion to vacate and for rehearing, which the court denied on January 5, 2018.  Petitioner appealed, and this court affirmed the circuit court's judgment on April 23, 2018.  *Cadena v. Buck*, 2018 IL App (4th) 180035-U.

¶ 13                                 D. Contempt Proceedings

¶ 14       In January 2018, respondent filed a verified petition for adjudication of indirect civil contempt, asserting petitioner had willfully not complied with the circuit court's November 2017 order to return the child to Illinois.  After a June 1, 2018, hearing, the circuit court entered a written order, finding petitioner in indirect civil contempt and ordering him to appear on June 8, 2018.  At the June 8, 2018, hearing, petitioner again did not personally appear.  The court entered an order for a bench warrant for petitioner's arrest without any geographical limits and set bond. The court stayed the warrant until June 13, 2018.  If the petitioner did not return M.B.C. by June 13, 2018, at 3 p.m., the warrant would issue, and respondent would be allowed to travel to Massachusetts to retrieve the child.  Petitioner failed to personally appear on June 13, 2018, and the circuit court issued the bench warrant.  The court also awarded temporary full residential custody of M.B.C. to respondent and allowed her to travel to Massachusetts to retrieve M.B.C.

¶ 15       In July 2018, respondent filed a petition for adjudication of direct and indirect

criminal contempt but later dropped the claim for indirect criminal contempt. On September 11, 2018, the circuit court entered a written order finding petitioner in direct criminal contempt for failing to appear before the court on six separate occasions. The court issued a bench warrant based on direct criminal contempt for petitioner's arrest and set bond. At a September 27, 2018, hearing, the court recalled that warrant and issued a new warrant with "no geographical limits to apply, and extraditable" and sentenced petitioner to six months in the county jail for direct criminal contempt. Petitioner appealed, and this court affirmed petitioner's direct criminal contempt finding and sentence. *Michael C. v. Amber B.*, 2019 IL App (4th) 180659-U.

¶ 16        In April 2018, petitioner filed a complaint to modify a foreign decree in Massachusetts. He also filed a motion seeking to have the Massachusetts court exercise jurisdiction over M.B.C., which was denied. Petitioner appealed the denial. The appeal had not been heard when respondent returned home with M.B.C. on October 4, 2018. Petitioner dismissed his appeal in December 2019.

¶ 17                              E. Later Proceedings

¶ 18        In March 2018, respondent filed a petition for allocation of permanent and temporary parenting time and allocation of decision-making authority. Based on the parties' joint oral motion, the circuit court entered a written order on January 8, 2019, appointing Joseph Foley as guardian *ad litem* for M.B.C. The next month, petitioner filed a motion for the evaluation of M.B.C.'s best interests, which the court granted after a hearing. The court appointed Luke Dalfiume, a clinical psychologist, as evaluator. In September 2020, petitioner moved to excuse the guardian *ad litem*. The court granted the motion and ordered the guardian *ad litem* to prepare and file a report before trial. In December 2020, petitioner filed a supplemental petition to relocate M.B.C. to Massachusetts, noting Dalfiume's custody

evaluation.

¶ 19         On December 7, 2020, the circuit court commenced the hearing on the parties' pending petitions, which lasted eight days. Petitioner testified on his own behalf, called respondent as an adverse witness, and presented the testimony of the following individuals: (1) Dalfiume, the appointed child custody evaluator; (2) Richard B., respondent's father; (3) Curt Maas, a Bloomington police detective; (4) Brad Melton, a Bloomington police detective; (5) Ben Brace, a Bloomington police officer; (6) Amy Keil, a former Bloomington police detective; (7) Bradley Massey, a Bloomington police officer; (8) Timmothy Carlton, a Bloomington police sergeant; (9) Matt Steinkoenig, a Normal firefighter; and (10) Barbara McDougall, petitioner's mother. He also presented around 70 exhibits and asked the court to take judicial notice of documents in a criminal case against respondent (McLean County case No. 16-CF-1424) and a driving under the influence case against respondent's nephew, H.B. (McLean County case No. 20-DT-86). Respondent testified on her own behalf and presented the testimony of the following witnesses: (1) Gretchen Burhke, M.B.C.'s first grade teacher; (2) Rose B., respondent's mother; (3) Kati McGuire-Hoeniges, a friend of respondent and the mother of one of M.B.C.'s friends; (4) David Finn, a licensed clinical psychologist who did a work product review of Dalfiume's custody evaluation; (5) Foley, the guardian *ad litem*; (6) Corinna B., respondent's sister; (7) Vera Traver, respondent's Narcotics Anonymous sponsor; and (8) William Newell, respondent's pastor. She also asked the circuit court to take judicial notice of two documents from M.B.C.'s juvenile case (In re M.C., No. 16-JA-25 (Cir. Ct. McLean County)), requested the court to consider the guardian *ad litem*'s report, and presented more than 35 exhibits. As such, the evidence presented on the pending petitions was voluminous. Since the parties are familiar with the evidence presented at the hearing, we will only set forth a brief summary giving the

necessary background facts.

¶ 20     Petitioner is the only child of Barbara McDougall, and he grew up in Boston, Massachusetts. He had a half sister and a stepsister. At age 22, petitioner received two driving under the influence convictions. He also had a driving under the influence conviction in 2014, a possession of a controlled substance conviction in 2014, and a possession of cannabis conviction in 2015. In 2008 or 2009, petitioner was hired by State Farm, and he stayed in Bloomington during the week. Petitioner began dating respondent in 2010, and they later moved in together, along with P.D. M.B.C. was born in February 2014, and respondent moved out with the children three months later. In May 2014, petitioner filed a petition seeking custody of M.B.C. Before a final custody order was entered on petitioner's petition, M.B.C. became the subject of a 2016 juvenile case after respondent's residence was found to contain a methamphetamine lab, drugs, and drug paraphernalia. Petitioner testified about numerous injuries to M.B.C. that occurred while M.B.C. was in respondent's care. Respondent denied physically abusing M.B.C. After the juvenile case was filed, petitioner initially did not have custody of M.B.C. In September 2016, petitioner was found fit and awarded custody of M.B.C. In March 2017, petitioner moved to Massachusetts with M.B.C. There, he first took M.B.C. to play therapy with Carissa Henderson and later to therapy with Dr. Carol Garfinkel.

¶ 21     On October 2, 2018, petitioner was arrested on the warrant in this case. Respondent allowed M.B.C. to remain with McDougall until respondent arrived in Massachusetts. McDougall had M.B.C. spend the night at his friend's home. Respondent got to petitioner's residence around 3 a.m. and was unable to pick up M.B.C. Eventually, respondent was able to pick M.B.C. up at the police station, and she took him back to Illinois.

¶ 22     Petitioner has remained in Massachusetts since he left Illinois in March 2017. His

mother resided with him. Petitioner was not currently in a romantic relationship. His employment allowed him to work from home. Petitioner had lots of extended family near where he lived in Massachusetts, including children around M.B.C.'s age.

¶ 23　　　Respondent's parents are Richard and Rose B., and respondent has three siblings, Corinna B., Derrick B., and Alex B. Derrick had three children, H.B., E.B., and G.B. Respondent began using drugs during her sophomore year of high school. By the time she graduated from high school in 2005, respondent was using heroin daily. In 2007, respondent was arrested and went to rehabilitation. She was sober when she got pregnant with P.D. that year. After P.D. was born, respondent used cannabis, drank alcohol excessively at times, and abused her Xanax prescription. Respondent stopped using cannabis and Xanax in 2013 when she started to have seizures. She was sober during M.B.C.'s pregnancy. After M.B.C. was born, respondent resumed using cannabis and Xanax and started abusing Adderall as well. When she moved out of her residence with petitioner, respondent moved in with Tyler Shaffer.

¶ 24　　　Respondent and Shaffer had multiple domestic violence incidents, which resulted in police involvement. One such incident was on December 19, 2014, during which Shaffer tossed M.B.C. in his baby carrier onto the porch. Another was on May 6, 2015. During a June 22, 2015, domestic violence incident, Shaffer hit respondent in the head with a belt. On July 21, 2015, a domestic violence incident began outside the presence of M.B.C., but M.B.C. was later brought to the scene.

¶ 25　　　After living with Shaffer, respondent lived with P.D.'s father, Colin D. In March 2016, respondent began using methamphetamine, and respondent and Colin moved into a new apartment on Market Street. On March 28, 2016, the police executed a search warrant for the apartment and found cannabis, methamphetamine, and several items indicating

methamphetamine was being made in the apartment. The police also found items clearly belonging to children. Respondent testified the apartment was searched before her children ever moved into the apartment. After the search, respondent drove Colin to South Carolina to evade the police. DCFS took M.B.C. and P.D. into protective custody. Respondent testified she had been sober since May 24, 2016. In June 2016, Rose filed a petition for legal separation from Richard since he was living in Colorado at that time and she wanted to be P.D. and M.B.C.'s foster parent in Illinois. When petitioner received custody of M.B.C., Rose became P.D.'s foster parent. Richard later filed for a legal separation in February 2020 to qualify as a caregiver for purposes of his veteran's pension. He admitted they still loved each other and lived together. The circuit court found Richard was "perpetrating fraud upon the Veterans Administration."

¶ 26 In January 2017, respondent pleaded guilty to one count of methamphetamine manufacturing related to the methamphetamine lab (McLean County case No. 16-CF-1424), one count of unlawful possession of a controlled substance (McLean County case No. 15-CF-704), and one count of unlawful possession of cannabis with the intent to deliver (McLean County case No. 15-CF-929). She received a sentence of 30 months' probation. Respondent had previously pleaded guilty to possession of cannabis (McLean County case No. 15-CM-1295).

¶ 27 After petitioner left Illinois with M.B.C., respondent tried making contact with petitioner and after several weeks was able to have a video chat with M.B.C. Respondent also sent presents and supplies for M.B.C. to petitioner's grandmother's address since she did not know respondent's address. A court-ordered video call schedule was eventually established.

¶ 28 When respondent brought M.B.C. back to Illinois, they lived at respondent's parent's house with P.D., H.B., and E.B. For a period of time, Rose lived in Colorado to care for G.B. A few months before the evidentiary hearing, respondent moved into her own home near

her parents with P.D. and M.B.C. The lease was in Corinna's name because respondent could not rent the home due to her criminal background. Corinna also cosigned respondent's automobile loan. At the time of the hearing, respondent had been working as a bookkeeper for five years and was attending Heartland College to become an accountant. M.B.C. along with P.D. attended Trinity Lutheran School. M.B.C. was in first grade and doing well in school. He had friends and participated in extracurricular activities in the community. When M.B.C. returned to Illinois, he received counseling from Kelly Knutson to address transitional issues such as expressing himself and sleep. Two months before the evidentiary hearing, Knutson stated M.B.C. did not need to continue with counseling. While M.B.C. was in respondent's care, the trial court established a schedule of three video calls per week for petitioner to visit with M.B.C. Petitioner also had two shorter visits and a lengthy summer visit (June 27, 2020, to August 1, 2020) with M.B.C. in Massachusetts.

¶ 29    After hearing all of the evidence, the trial court pronounced its ruling on December 17, 2020, by addressing each best interest factor for all three issues. In the end, the court awarded petitioner a majority of the parenting time, allowed him to relocate M.B.C. to Massachusetts, and granted him final decision-making authority. The court declared its order was effective immediately. A written order was entered on December 21, 2020. On January 5, 2021, the court entered an order terminating petitioner's child support obligation.

¶ 30    On January 7, 2021, respondent filed a timely notice of appeal indicating she was appealing both the December 2020 and January 2021 judgments. The notice was in sufficient compliance with Illinois Supreme Court Rule 303 (eff. July 1, 2017). Accordingly, we have jurisdiction of the judgments under Illinois Supreme Rules 301 (eff. Feb. 1, 1994) and 304(b)(6) (eff. Mar. 8, 2016).

¶ 31                               II. ANALYSIS

¶ 32                            A. Preliminary Matter

¶ 33        Despite the voluminous amount of evidence presented in this case, respondent's

original appellant brief had a statement of facts that was only three and half pages long.  On May

7, 2021, this court granted respondent 14 days to file an amended brief in compliance with

Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020).  Respondent filed an amended brief on

May 20, 2021.  On June 2, 2021, petitioner filed an objection to this court's procedure.

Regardless of any inadequacy in the statement of facts, we will address the merits of this appeal.

The large volume of evidence and our order for compliance with Rule 341(h)(6) to assist us in

reviewing the evidence have necessarily taken us slightly beyond the time frame for issuing our

decision under Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018).  Nonetheless, the

150-day timeframe must be subordinate to the justice this case deserves, and as noted above,

good cause exists for noncompliance with the timeframe.

¶ 34                          B. M.B.C.'s Best Interests

¶ 35        Respondent contends the circuit court erred by (1) denying her request for

allocation of the majority of the parenting time, (2) denying her request for allocation of sole

significant decision-making to her, and (3) granting petitioner's request to relocate M.B.C. to

Massachusetts.  Petitioner contends the court's judgment was proper.  In this case, multiple

statutory provisions were involved in the court's judgment.

¶ 36        Section 602.5 of the Illinois Marriage and Dissolution of Marriage Act

(Dissolution Act) (750 ILCS 5/602.5 (West 2018)) addresses the allocation of significant

decision-making responsibilities and sets forth a nonexclusive list of factors to consider in

determining the child's best interests for the purpose of allocating significant decision-making

- 11 -

responsibilities.  The factors applicable to this case are the following:  (1) the child's wishes, taking into account his maturity and ability to express reasoned and independent preferences as to decision-making; (2) the child's adjustment to his home, school, and community; (3) the mental and physical health of all individuals involved; (4) the parents' ability to cooperate to make decisions, or the level of conflict between the parents that may affect their ability to share decision-making; (5) the level of each parent's participation in past significant decision-making with respect to the child; (6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child; (7) the parents' wishes; (8) the child's needs; (9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement; (10) whether a restriction on decision-making is appropriate under section 603.10 of the Dissolution Act (750 ILCS 5/603.10 (West 2018)); (11) each parent's willingness and ability to facilitate and encourage a close and continuing relationship between the other parent and the child; (12) the occurrence of abuse against the child or other member of the child's household; and (13) any other relevant factor the court expressly finds.  750 ILCS 5/602.5(c)(1) to (c)(11), (c)(13), (c)(15) (West 2018).

¶ 37        Next, section 602.7 of the Dissolution Act (750 ILCS 5/602.7 (West 2018)) concerns parenting time and, like section 602.5, provides a nonexclusive list of factors to consider in determining the child's best interests for the purpose of allocating parenting time. Those factors applicable to this case are the following:  (1) each parent's wishes; (2) the child's wishes, taking into account his maturity and ability to express reasoned and independent preferences as to parenting time; (3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the petition; (4) any prior

agreement or course of conduct between the parents relating to caretaking functions with respect to the child; (5) the interaction and interrelationship of the child with his parents and siblings and with any other person who may significantly affect the child's best interests; (6) the child's adjustment to his home, school, and community; (7) the mental and physical health of all individuals involved; (8) the child's needs; (9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement; (10) whether a restriction on parenting time is appropriate; (11) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs; (12) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child; (13) the occurrence of abuse against the child or other member of the child's household; and (14) and any other relevant factor the court expressly finds. 750 ILCS 5/602.7(b)(1) to (b)(10), (b)(12) to (b)(14), (b)(17) (West 2018).

¶ 38    Last, section 609.2 of the Dissolution Act (750 ILCS 5/609.2 (West 2018)) addresses a parent's relocation. Section 609.2(g) of the Dissolution Act (750 ILCS 5/609.2(g) (West 2018)) contains a nonexclusive list of factors to consider in determining the child's best interests when a parent has relocated. Those factors are the following:

"(1) the circumstances and reasons for the intended relocation;

(2) the reasons, if any, why a parent is objecting to the intended relocation;

(3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment;

- 13 -

(4) the educational opportunities for the child at the existing location and at the proposed new location;

(5) the presence or absence of extended family at the existing location and at the proposed new location;

(6) the anticipated impact of the relocation on the child;

(7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs;

(8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation;

(9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child;

(10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and

(11) any other relevant factors bearing on the child's best interests." 750 ILCS 5/609.2(g) (West 2018).

None of the aforementioned best interests factors are controlling, and "the weight to be accorded each factor will vary depending on the facts of the case." *In re Marriage of Bhati*, 397 Ill. App. 3d 53, 61, 920 N.E.2d 1147, 1153 (2009) (addressing the best interest factors for removal under a prior version of the statute (750 ILCS 5/609(a) (West 2006))). We also note "[a] determination of the best interests of the child cannot be reduced to a simple bright-line test, but rather must be made on a case-by-case basis." *Bhati*, 397 Ill. App. 3d at 60-61, 920 N.E.2d at 1153.

¶ 39        This court gives great deference to a circuit court's findings regarding the child's

best interests because that court has the better position to observe the parties' temperaments and personalities and assess the witnesses' credibility. *In re Marriage of Stopher*, 328 Ill. App. 3d 1037, 1041, 767 N.E.2d 925, 928 (2002). This court will not reverse a circuit court's determination of what is in the child's best interests "unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred." *In re Marriage of Eckert*, 119 Ill. 2d 316, 328, 518 N.E.2d 1041, 1046 (1988); see also *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶¶ 47, 53, 165 N.E.3d 501 (noting both the circuit court's ruling on the allocation of parenting time and decision-making responsibilities will not be disturbed unless they are against the manifest weight of the evidence). "A decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence." *Bhati*, 397 Ill. App. 3d at 61, 920 N.E.2d at 1153. Moreover, under a manifest weight standard of review, this court does not substitute its judgment for that of the trial court on such matters as witness credibility, the weight to be given evidence, and the inferences to be drawn from the evidence. *In re A.W.*, 231 Ill. 2d 92, 102, 896 N.E.2d 316, 322 (2008).

¶ 40        As to all three issues, respondent challenges the trial court's explanation for its findings on almost all of the best interests factors. While respondent claims the court's findings were arbitrary, she is essentially asking this court to reweigh the evidence and best interests factors and substitute our judgment for that of the trial court's, which we will not do.

¶ 41        This was a particularly difficult case. While both parents showed they loved M.B.C. and wanted what was best for him, their relationship was toxic, and each of them had not always made decisions in M.B.C.'s best interests. Respondent had a history of substance abuse and being the victim of domestic violence in M.B.C.'s presence, and petitioner had a history of

driving under the influence and disobeying court orders to return M.B.C. to Illinois. Also, at times, both petitioner and respondent did not facilitate M.B.C.'s relationship with the other parent. Over the course of the protracted litigation, both parties made improvements in their own lives and some progress in communicating with each other. Additionally, Dalfiume, the custody evaluator, opined petitioner should be allocated the majority of the parenting time, and Foley, the guardian *ad litem*, opined respondent should receive a majority of the parenting time. Given the evidence before the trial court in this case, the trial court in evaluating each individual best interests factor could have found many of the factors favored petitioner or respondent, and either finding would not have been against the manifest weight of the evidence. Thus, the evidence did support the trial court's finding several factors carried little weight.

¶ 42        The trial court first addressed parenting time and found a "tremendously significant factor" was the child's relationship with other people who significantly affect the child's best interests. The evidence supports the court's emphasis on this factor because petitioner's mother resided with him and, for most of the litigation, respondent resided with her parents, as well as her daughter, niece, and nephew. Thus, at both residences, people other than the parties played a large role in M.B.C.'s day-to-day care and upbringing. The court voiced concerns about respondent's father's capacity to care for M.B.C., respondent's father's negative moral influence, and respondent's mother's negative moral influence. When generally discussing parenting time, the court again noted the moral climate created by respondent's family, which it found consisted of "lying and drugs." On appeal, respondent does not contend the court erred by making the aforementioned findings but only asserts the court failed to explain how its moral concerns impacted M.B.C. If M.B.C. had little contact with respondent's family, then respondent's assertion would be a legitimate challenge to the court's finding. However,

when M.B.C. lived with respondent and her parents for almost the entire time after he returned from Massachusetts, respondent's family's culture would clearly impact him. Given the evidence showed respondent's parents would go to extreme lengths to obtain favorable treatment for themselves or their children, it was not against the manifest weight of the evidence for the trial court to find such a culture outweighed having M.B.C. live with his sibling, P.D.

¶ 43    As to substance abuse, the trial court found respondent posed a tremendous risk of harm should she not remain abstinent. Respondent asserts that finding is arbitrary and one sided because the evidence showed petitioner was also at risk to relapse and have substance abuse issues. However, the evidence showed respondent's substance abuse was severe and had directly impacted M.B.C. and put him at risk for harm. On the other hand, no evidence was presented petitioner's prior use of alcohol and controlled substances had any impact on M.B.C. Thus, it was not improper for the court to find a potential relapse by respondent would put M.B.C. at a tremendous risk for harm but not a potential relapse by petitioner. Accordingly, we disagree with respondent the court's finding was arbitrary.

¶ 44    Another factor the trial court highlighted was respondent's ability to provide M.B.C. with a sense of security and stability. Respondent's name was not on the lease to her residence, and thus she risked being evicted. The court explained that fact showed respondent's "current willingness to take risks and be dishonest to gain her desires." On appeal, respondent notes her testimony in which she explained having her sister's name on the lease was the only way she could rent a residence. While it was laudable respondent wanted to move out of her parents' home, she needed to do so in a forthright manner that would provide her and her children stable housing. The court's concerns about respondent's lease were supported by the evidence. The court was also concerned about M.B.C.'s safety and noted respondent's actions in

the past of exposing M.B.C. to her abusive paramours and neglecting M.B.C.'s dental care. The court further noted respondent's recent action of allowing P.D. to have contact with P.D.'s father, who had not regained his fitness as a parent. Those findings were supported by the evidence. Thus, the court had past and recent evidence on which to find a concern about safety.

¶ 45    Accordingly, we find the trial court's conclusion the best interest factors favored awarding the majority of the parenting time to petitioner was not against the manifest weight of the evidence.

¶ 46    As to relocation, petitioner presented ample evidence showing a real and legitimate need to leave Illinois and be distanced from respondent's parents, who were trying to frame him and prevent him from retaining custody of M.B.C. Implicit in the trial court's ruling was a finding the evidence demonstrated petitioner could not live near respondent and her parents. Petitioner chose to move to a location where he had lots of family and support. Moreover, as the court noted, M.B.C. had lived in both places, was familiar with both communities, and was used to having his parents living a great distance from each other. A long-distance parenting plan was also not new to the parties. Evidence was presented showing both parties had not always facilitated the other parent's calls with M.B.C. Thus, we find respondent's claims do not show the trial court's judgment allowing relocation to Massachusetts was in M.B.C.'s best interests was against the manifest weight of the evidence.

¶ 47    As to final decision-making authority, the evidence supports the trial court's conclusion the fourth factor regarding the parents' ability to cooperate to make decisions or the level of conflict between them that may affect their ability to share decision-making was a significant factor. The court found the parties had a great deal of conflict between them. The evidence showed the parties had an antagonistic relationship, had often disagreed on how to

handle issues related to M.B.C., and had a history of sometimes not facilitating M.B.C.'s relationship with the other parent. Moreover, the court noted the litigiousness of this case and the fact the parties had only one example of being able to talk on the telephone about an issue. The distance between the parties also made joint decision-making very difficult. As such, the trial court's finding it was in M.B.C.'s best interests to award petitioner, who also received the majority of the parenting time, final decision-making authority was not against the manifest weight of the evidence.

¶ 48                                    III. CONCLUSION

¶ 49            For the reasons stated, we affirm the McLean County circuit court's judgment.

¶ 50            Affirmed.