NOTICE

Decision filed 07/30/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250001-U

NO. 5-25-0001

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| BRIAN NELSON, | ) | Williamson County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | No. 22-DC-90 |
| and | ) | |
| | ) | |
| LINDSAY NELSON, | ) | Honorable |
| | ) | John W. Sanders, |
| Respondent-Appellee. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices Boie and Sholar* concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's allocation of parenting time was not against the manifest weight of the evidence. The court's decision not to award appellant a portion of appellee's pension was an abuse of discretion. The court's division of all other assets and debts did not constitute an abuse of discretion. The court's determination that no dissipation occurred was not against the manifest weight of the evidence. The court's allocation of child support and maintenance did not constitute an abuse of discretion.

¶ 2    The parties were granted a judgment of dissolution of their 20-year marriage. After nine days of trial testimony, the trial court issued a ruling on all aspects of the case, including parenting time for the three children, the division of marital assets and debts, and child support and

_____

*Originally Justice Welch was assigned to the panel. Justice Sholar was later substituted on the panel and has read the briefs.

1

maintenance payable by Brian Nelson to Lindsay Nelson. Brian appealed, and for the following reasons, we affirm in part and reverse in part.[1]

¶ 3                                                          I. BACKGROUND

¶ 4      Only those motions that are necessary for an understanding of the issues on appeal will be mentioned, as the parties filed no less than 33 petitions throughout the pendency of this matter.

¶ 5      On July 20, 2022, Brian Nelson filed a combined petition for dissolution of marriage and a petition for emergency temporary relief against Lindsay Nelson. The parties were married on September 4, 2004, and have three children between them: Madison N., born in 2006; Chase N., born in 2009; and Hudson N., born in 2011. In addition to a judgment of dissolution, he requested equal parenting time with the children and an equitable division of the parties' assets and debts. The emergency count of the petition requested equal parenting time and joint decision-making, stating that he and Lindsay had been equally responsible for the children's caretaking functions and decisions since their birth.

¶ 6      In her response to the petition, Lindsay pointed out that there was a no-contact bond in Brian's pending domestic violence charge in which Madison was the victim (Williamson County case No. 22-DV-106). Lindsay alleged that Brian was to have no contact with her or the children. She also filed a counterpetition for dissolution of marriage, requesting sole parenting time and decision-making responsibilities, as well as a petition for temporary relief, seeking sole parenting time and decision-making, child support, and maintenance.

---

[1]We note that, pursuant to Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), except for good cause shown, this court is to issue a decision within 150 days after the filing of the notice of appeal. The decision in this case was due to be filed on or before May 30, 2025. However, the following motions were filed in this case: a January 31, 2025, motion for extension of time to file the record on appeal; a March 11, 2025, motion for extension of time to file the appellant brief; an April 11, 2025, motion for extension of time to file the appellee brief; and an April 22, 2025, motion to file appellee's brief *instanter*. Due the motions for extension of time filed in this case, we find good cause to issue this order past the deadline.

¶ 7    A September 14, 2022, docket entry indicated that the parties were present in court and that the trial court notified them it would rule on temporary child support in a summary manner. Lindsay was to file proposed calculations for child support, and Brian was to submit his objections thereto within 14 days. A written order was filed on that same date, granting Brian permission to enter the marital residence, accompanied by an officer on September 15, 2022, to retrieve his clothing, medications, and personal hygiene items.

¶ 8    On September 15, 2022, Lindsay filed her child support and maintenance calculations. She calculated the child support payable from Brian to Lindsay as $2,097.92 per month and the maintenance as $2,454.80 for 13.68 years. Attached to her calculations were the worksheets summarizing how the calculations were derived.

¶ 9    On September 16, 2022, the trial court appointed Patrick Sharpe as the guardian *ad litem* (GAL). The trial court ordered that the GAL's initial fees were to be paid by Lindsay, without prejudice to the trial court's later reallocation of these payments.

¶ 10    On September 26, 2022, Brian filed an objection to Lindsay's calculations, solely including arguments as to why maintenance should be denied. The objection did not address child support, nor did it include any calculations for either child support or maintenance.

¶ 11                          A. Temporary Child Support

¶ 12    On October 12, 2022, the trial court entered a docket entry indicating that it reviewed Lindsay's calculations and Brian's objections and noted that Brian's objection "was not as to the parties' incomes as stated in the mother's worksheet but rather only as to the amount of maintenance allocated for father to pay." It noted that the parties had been informed that the trial court would rule on temporary child support in a summary manner. The trial court ordered Brian to pay temporary child support of $2,347 a month retroactive to July 20, 2022, based on the

numbers provided by Lindsay.

¶ 13                                    B. Temporary Hearings

¶ 14    The testimony and evidence regarding temporary matters occurred over two days, November 28, 2022, and December 6, 2022. For clarity, each witness's testimony is summarized individually, even if they testified on multiple days. The following is a summary of the relevant testimony.

¶ 15                                    1. Lindsay Nelson

¶ 16    Lindsay and the children resided in Carterville, Illinois, in the marital residence. Brian paid the mortgage, which was roughly $3,400 per month. The parties moved there from Michigan two years prior and purchased the house for $525,000. Lindsay noted that there were several issues with the house that needed to be addressed before it could be placed on the market, but the pool had been winterized.

¶ 17    The parties had three children between them, and Madison, who was 16, was the victim of a domestic violence incident by Brian that occurred in June 2022. In that case, a bond was in place that mandated no contact between Brian and all three children. Brian had violated the no-contact order 51 times since it was entered.

¶ 18    Before the incident that led to Brian's arrest, there had been previous physical incidents between Madison and Brian. There had also been previous instances of conflict between Brian and the two boys. As a result of the incident involving Madison, a Department of Child and Family Services (DCFS) investigation was conducted, which was unfounded. She noted that the children were in counseling.

¶ 19    Between November 2020 and August 2022, Lindsay was not employed, but she obtained employment as a teacher in August 2022. Her car was repossessed in November 2022, leaving her

4

without a permanent mode of transportation. She did not have the financial ability to purchase or rent a vehicle, as Brian had not provided her with any financial assistance since June 2022. Lindsay testified that, after paying all her monthly expenses, she was left with $1.58 per month. She paid for the children's activities, groceries, and household utilities, while Brian paid the mortgage and internet bills.

¶ 20                                   2. Brian Nelson

¶ 21    Brian testified that he had been staying in a hotel but had since located stable housing in DuQuoin, Illinois, where he paid a monthly rent of $1,000. He also paid the mortgage for the marital residence and the utility bills, despite Lindsay's testimony that she had done so. He believed, based on his financial circumstances, that he was unable to make any contribution towards maintenance. Since the parties separated in June 2022, he paid $32,000 in bills that "benefited" Lindsay and the children. Brian testified that during that same period he earned approximately $45,000. He indicated that he would agree to pay the mortgage on the marital residence.

¶ 22    Brian desired joint counseling with the children. He discussed disturbing things he saw on September 15, 2022, when he entered the marital residence to retrieve his belongings. For instance, his daughter had a dry-erase board on which her friends had written negative things about him. He further stated that he was on a couple of "hate lists." Prior to the incident with his daughter, he had a close relationship with the two boys, often engaging in activities together, but he had a rocky relationship with his daughter.

¶ 23    Brian was employed as an international representative for the International Union of Operating Engineers. He covered 140,000 workers in 16 states and taught union leadership. He mentored new union representatives and new organizers. Before that, he was a combat veteran and

was honorably discharged from the military.

¶ 24 Brian needed clothes, office equipment, and items that were still at the marital residence. His employment required him to have a home office, and he requested that the trial court order Lindsay to return his office furniture and supplies to him. Since he had no access to his home office for some time, he claimed his job was at risk.

¶ 25 Since the commencement of the divorce, Brian had not paid Lindsay any child support. He was living with a significant other in her home, where he paid a little less than half of those expenses. He acknowledged that Lindsay was employed as a teacher, but that, due to his income and the nature of his job, Lindsay was able to be a stay-at-home mother during their marriage.

¶ 26 In addition to the pending domestic battery case, Brian had been charged with a misdemeanor for violating the no-contact provision of the bond by having contact with Lindsay. He was also charged with violating the trial court's September 14, 2022, order for entering the marital residence before the police officers arrived.

¶ 27                                   C. Temporary Order

¶ 28 After hearing closing arguments, the trial court ordered that Brian was to have no contact with Madison or with her counselor until the criminal case had been resolved or until further hearing. The trial court ordered phone communication with the two younger boys every Sunday from noon to 1 p.m. and on Wednesdays from 7 p.m. to 8 p.m. Lindsay was to check with the boys' counselor to determine whether Brian should be included in their counseling sessions. The trial court found that there was sufficient evidence to support the following: Lindsay was in reasonable need of maintenance, she was unable to support herself through appropriate employment, and she was entitled to temporary maintenance. He utilized the figures of Lindsay's gross income of $2,904 per month and Brian's gross income of $14,050 per month. He ordered

6

maintenance to be retroactive to July 20, 2022. Regarding the amount of maintenance, the trial court ordered Lindsay to submit a calculation within 14 days and for Brian to file an objection 7 days thereafter.

¶ 29    As for the allocation of debts during the pendency of the matter, the trial court ordered that the parties were to split the mortgage payment. Brian was to pay an additional $1,000 per month towards a $9,388 child support arrearage. The marital residence was to be listed for sale, and Brian was responsible for $10,000 in repairs. Brian was ordered to pay the credit cards, and Lindsay was ordered to pay the household expenses. The trial court indicated "the reason for the allocation of the debts this way is the husband makes substantial greater earning" than Lindsay. Brian was to have no access to the marital residence.

¶ 30    On December 7, 2022, Lindsay filed her calculation for temporary maintenance. Using the gross figures of income announced by the trial court, Lindsay calculated temporary maintenance of $2,904.66 per month for a period of 165 months. Brian did not file his proposed temporary maintenance calculation. On December 19, 2022, an order for temporary maintenance was entered, which ordered Brian to pay Lindsay $2,904.66 per month as temporary maintenance, retroactive to July 20, 2022.

¶ 31    An agreed-upon written order, dated June 26, 2023, indicated that the marital residence had been sold and that the proceeds of the sale were to be deposited into the trust account of Lindsay's attorney, as the parties disagreed regarding the division of the proceeds.

¶ 32                                    D. Dissipation Claims

¶ 33    On January 10, 2023, Brian filed a notice of claim of dissipation, which alleged that Lindsay had dissipated "countless personal items" of his as well as allowed the marital residence to fall into disrepair.

7

¶ 34 On September 13, 2023, Brian filed an amended notice of claim of dissipation, claiming among other things that Lindsay destroyed the marital residence in that she failed to upkeep the pool, allowed mold to fester in parts of the house, allowed water damage to occur, and failed to maintain the landscaping.

¶ 35                                    E. Final Hearing(s)

¶ 36 The testimony and evidence regarding final matters occurred over nine days (December 11, 2023, January 9, 2024, January 18, 2024, January 30, 2024, February 20, 2024, March 8, 2024, August 7, 2024, August 21, 2024, and August 23, 2024). For clarity, each witness's testimony is summarized individually, even if they testified on multiple days. The following is a summary of the relevant testimony.

¶ 37                                    1. Brian Nelson

¶ 38 Brian spent several of the hearing dates testifying regarding the value of each item of marital property, which will not be summarized herein. He further discussed in detail the joint credit card debt and a LendingClub loan of the parties, totaling $70,134, all of which he consolidated and made payments on. The LendingClub loan was used to pay off Lindsay's student debt, and the credit cards had been closed. Brian had a $10,000 IRS tax debt stemming from the parties cashing out his 401(k) to pay off debts two weeks before their separation. The parties owned a Suburban that was repossessed, resulting in a loan deficiency of $800, which Brian paid. Lindsay had not contributed towards any of the marital debt that he was paying. Brian indicated that he had borrowed $20,172.80 from his girlfriend, Heather Brown, to cover his car expenses, as well as to pay the GAL, rent, household expenses, legal fees, and some of his business expenses.

¶ 39 When Brian was first released from jail in June 2022, he lived in a hotel, in a tent at a state park, and sometimes out of his truck. At one point, he moved into a friend's home, and then he

met his girlfriend and moved in with her in October 2022. Due to the pending criminal case, he was not permitted to enter the home. After Lindsay moved out, Brian was given the keys to the house, and he went there in January 2023 to retrieve some of his belongings. Brian testified at length regarding all the items he believed were damaged, destroyed, or dissipated by Lindsay during her exclusive possession of the home.

¶ 40  Regarding the marital residence, the parties initially had a contract for its sale for $630,000. However, it sold for $580,000 because, after inspection, significant issues with the pool were discovered. Due to the problems with the pool, the sale price of the house was reduced by $50,000. Lindsay had exclusive possession of the home during the period when the pool needed to be maintained. Brian testified that during a hearing in December 2022, Lindsay testified under oath that the pool had been professionally closed. However, he had since discovered that the pool had not been professionally closed, and Brian blamed Lindsay for the failure to maintain the pool. Brian was granted access to the home in January 2023, after Lindsay and the children had moved out. Upon his return, he noticed new damage to the house's internal structure and the presence of mold. He also testified regarding his observation of the damage to the pool. He stated that he noticed the motor was still running, so he turned off the circuit breaker, which in turn turned off the freeze protection. After that, he took no further action to rectify the issue. Brian also admitted that he never went back to mow the grass because they did not have a lawn mower; instead, they always had their lawn professionally landscaped.

¶ 41  Before the separation of the parties, he had a strong relationship with his children and spent every weekend doing activities with them. The boys were involved in various extracurricular activities, including student government, soccer, recreational basketball, baseball, private baseball, regular soccer, private soccer, and football. Madison participated in volleyball, recreational

basketball, and various clubs. Brian and Lindsay coached several academic clubs.

¶ 42    Brian used to be very close to Madison, but since June 13, 2022, he had been blocked from everything with his children. He had been denied access to pictures, and there were restraining orders prohibiting him from visiting the schools. He had not seen his children in 800 days, and the video visits had ceased. He was court-ordered to have video visits commencing in December 2022, and the first several times, the wrong number was provided to him, so the video visits did not occur. The first time he was able to have a video visit, the boys told him that he broke into the house, and that he used to hit them every day, get in their faces, and scream at them. The video visits had not gone well and had not occurred for quite some time. From his perspective, his relationship with his children was in a "very bad place." He sought to repair the relationship to the greatest extent possible. He had contacted Dr. John Atkins, a clinical psychologist specializing in family reunification, and requested that the court order family reunification with the children.

¶ 43    He had been employed full-time by the headquarters of the International Union of Operating Engineers. However, because he had to take multiple days off work to attend court, he was fired. He filed for unemployment and was seeking employment. The insurance he had for the children was cancelled. Brian admitted that the letter of termination from his employer stated the reason for his termination was his "subpar work performance." He also admitted that, as to the arrearage amount of $21,564.30 contained in the January 11, 2023, order, he had made only several payments, with the last one being in March 2023.

¶ 44    Brian posted numerous times on various social media platforms his views on the police investigations in this matter, parental alienation, videos of Lindsay, pictures of his children, and his updates on the progress of his court cases.

¶ 45    Brian testified about the June 13, 2022, incident. Lindsay had started an argument and

10

locked herself in the basement with the children, telling the children that she only felt safe when they were around her. Lindsay told Madison that Brian wanted Lindsay to kill herself. Madison "started flipping out on me thinking I wanted my wife to kill herself." Madison was recording Brian, and he told her not to record him. He grabbed the phone from her, and she scratched him, started hitting him, and "going absolutely crazy." He finally got Madison on the ground where he was holding her. While this was occurring, Lindsay "just sat on the bed with her legs crossed," recording the incident. After the altercation with Madison, he sat outside on the porch, waiting for the police. Pictures of Brian's injuries caused by Madison were introduced as evidence.

¶ 46    Brian testified regarding previous incidents of violence between him and Lindsay and played some videos regarding them. He testified about an incident that occurred on Easter in 2022, in which he was attempting to leave in a car. Lindsay opened the door right as he was driving off, which automatically engaged the emergency brake. Madison ran out and started punching him from behind. Brian later went up to Madison's room to yell at her, and when he got up there, Madison grabbed the glasses off his face and snapped them. Madison tried to gouge his eyes out, and so he bit her on her wrist. He testified that Lindsay watched the whole thing and did nothing to intervene once again. During the last month of their marriage, the physical violence inflicted by Lindsay against Brian became common, so he started recording them.

¶ 47                                    2. Lindsay Nelson

¶ 48    Lindsay was employed by Lick Creek Elementary School with a salary of $29,663.11. Her monthly gross income was $3,090.77. She had a pension through the Teacher Retirement System (TRS) worth approximately $3,161.32. Lindsay received maintenance of $2,904.66 and child support of $2,347 per month, bringing her total gross monthly income as of the hearing date to

$8,342.43. There was an arrearage for both child support and maintenance totaling approximately $27,000 or $28,000. Brian had not made regular payments toward the arrearage.

¶ 49    As to the dissipation claim, Lindsay testified that she and the children watched YouTube videos and determined how to winterize the pool themselves. She did not have the pool professionally closed and denied testifying to that effect. She admitted that the contract for the sale of the home specified the pool was to be in good working order, and that it was operational when she closed the pool. However, after a home inspection, the potential buyers discovered that it was not in good working order, and Lindsay admitted that a part of the reason for reducing the sale price of the house from $630,000 to $580,000 was due to the condition of the pool.

¶ 50    Lindsay's parents purchased a home on September 25, 2022, and she and the children moved into that home at the end of December 2022. She paid her parents $2,000 a month for rent. After she moved out of the marital residence, Lindsay continued to pay the utility bills for that home. From the date of separation in June 2022 to the court hearing in December 2022, Lindsay did not make any mortgage payments on the house. After the hearing in December 2022, the trial court ordered both parties to pay one-half of the mortgage. Lindsay started paying her half of the mortgage once she began receiving her maintenance payments in February 2023. She contacted the mortgage company in February 2023 to attempt to make her half payment, and they informed her that, since the mortgage payments were significantly behind schedule, they would not accept a partial payment unless she was paying off the entire amount. Lindsay was unable to make the required $13,000 payment, and as a result, the house went into foreclosure in April or May.

¶ 51    Lindsay purchased a vehicle for which she was making payments. Brian had a car that was purchased during the marriage, and that had equity in it. As to the credit card debt, she testified about those she was aware of and those she was not. She removed her name from all joint credit

12

cards and did not have any other credit cards in her name. She stated that she was not aware of the LendingClub loan, as Brian handled all the finances. The only personal loan she had was for her vehicle. She did not dispute that Brian would be entitled to one-half of the marital portion of her pension. She requested one-half of the marital portion of Brian's pensions, maintenance, and child support. She agreed to pay half of the debt on the two large credit card balances as of the date of separation.

¶ 52    Since June 2022, the children spent 100% of the time with her. The June 13, 2022, video of the incident between Madison and Brian was played over Brian's objection. The video started with Brian and Madison on the floor fighting over Madison's phone. Brian was demanding the phone, and Madison was yelling, "Get off of me, get off of me." The scuffle lasted several seconds, and she kicked him off her and stood up, telling him not to touch her. He attacked her, and she fell to the floor with him on top of her, and she was hitting him, telling him to get off of her. She kept yelling for him to get off her, and he stopped, and they both got up. It seemed to have calmed down when he attacked her again, grabbing her around her neck and pushing her extremely hard into the wall. He then put her in a chokehold from the front. She repeatedly yelled "don't touch me" and "get off of me." He eventually let go of her neck. She asked him what his problem was and whether this is how he treated his daughter and he yelled "shut the fuck up" and the video ended. It was this incident that formed the basis for the domestic violence charge that Brian was facing, and which was still pending. Chase was present and witnessed the incident; since that event, the children have been undergoing counseling.

¶ 53    The boys participated in Zoom calls with Brian, which were recorded. Portions of some Zoom calls were played in court. They mostly depicted Brian trying to engage the boys in

13

conversation despite both remaining silent. As of April 2024, Brian had not attended any Zoom calls with the boys.

¶ 54    Lindsay objected to Brian's request to order the boys to attend reunification counseling with Dr. Ed Atkins. She believed that Brian needed to seek mental health counseling on his own before reunification was possible. After that, she would be open to reunification counseling, even though the children were not. She requested that she have all parenting time and all decision-making authority until the counselor recommended otherwise.

¶ 55    Lindsay testified that there was physical abuse inflicted upon her by Brian during the marriage and discussed her version of the events of the incidents depicted on the videos that Brian played.

¶ 56                                    3. Heather Brown

¶ 57    Heather Brown, Brian's paramour, lived in DuQuoin and was employed as an assistant lecturer at Southern Illinois University. She saw Brian every single day, and she testified that he did not exhibit any behavior that would cause her concern about being around children. She had not observed any mood swings or any violent tendencies. She had a 15-year-old child with whom Brian had a great relationship.

¶ 58                                    4. *In camera* Interview

¶ 59    The attorneys for both parties, as well as the GAL, were present during the *in camera* interviews. Madison was 17 years old and a senior in high school. She testified she had a very good relationship with Lindsay. There were good times with Brian, but the bad outweighed the good. She indicated that things had been terrible for months leading up to the incident. There was a lot of name-calling, screaming, and yelling. He would call her a loser and a "Carterville whore." There were also abusive incidents towards her and her brothers when they were in Michigan, which

14

became more frequent when they moved to Illinois. Madison witnessed Brian hit Lindsay, and at night, she heard Brian screaming at Lindsay. Following the incident in June 2022, she began attending counseling sessions, which she found beneficial. She had not spoken to Brian since June 2022.

¶ 60   Maidson saw Brian's online posts, and he believed he had not done anything wrong. She did not want a relationship with him and was not interested in reunification counseling. She knew, based on what she saw in his posts, that he was going to lie. He told her that his actions should be excused because he was a combat veteran. Even if he underwent counseling and realized the gravity of the situation, she remained uninterested in trying to work towards something positive in the future, and believed her brothers felt the same. Her brothers did not like participating in the video calls and told her what happened during them. Once, Chase told her that Brian had called him a coward. Hudson came home from school one day and told her he was being teased because his friends viewed Brian's TikTok videos. She did not want the trial court to disclose to Brian what she had said in the *in camera* interview because she was afraid he would post it on social media.

¶ 61   Chase was 15 years old and in the ninth grade. He had a good relationship with Lindsay. They watched movies together and played board games. In June 2022, he had a strained relationship with his father and did not wish to have a relationship with him. He found it irritating that Brian refused to acknowledge anything that had happened and lied about it. Brian liked to believe he was the best father ever and did not take responsibility for his actions. Chase recalled an incident when Brian screamed at Madison and ripped up her homework. There was another time in 2020 when Brian pushed him down the stairs. Chase was present for the incident that occurred in June 2022 with Madison and had not spoken to Brian since. Chase went to therapy for a couple of months, and life improved after Brian left in June 2022, as it became calmer. He said

15

it felt good not to see his father. He was not interested in reunification counseling and did not want to have a relationship with Brian. Chase said that his father would not be cooperative and would not "own up to anything he's done." He believed Hudson felt the same way. As to Brian's posts on TikTok, Chase found them embarrassing.

¶ 62    Hudson was 13 years old and in the eighth grade. He watched movies with his mother, and she took him places like fishing and to his soccer tournaments. Brian could lose his temper easily, and hiking with him on family trips was fun, but he could get mad very quickly. Hudson was quiet during the video calls with his dad because he had no "intention to talk to him." His life was better with just his mother as opposed to when his father lived with them. When Brian lived with them, they were walking on eggshells. He was not interested in doing anything with Brian in the future. He feared Brian, as Brian had stomped on him before.

¶ 63                              5. Patrick Sharpe

¶ 64    Patrick Sharpe testified that he filed his GAL report on February 8, 2024. He had not been provided with any evidence that Brian had participated in individualized mental health counseling, but Lindsay had. He stated that, after witnessing the *in camera* interview and reviewing the evidence at trial, he would not change his recommendation contained in his report.

¶ 65                              F. GAL Report

¶ 66    Sharpe interviewed the parties, as well as family friends and relatives. He also interviewed Madison, who was adamant that Brian had attacked her in the June incident. She felt that Brian's media posts were inappropriate. Madison stated that before the June 2022 incident, things were not going well, as Brian demanded perfection from everyone and was challenging to deal with if things were not perfect. She had no interest in attending counseling with him.

¶ 67    Sharpe spoke with Hudson and discussed his schooling and passion for soccer. Sharpe noted that when he turned the conversation to video calls with Brian, "there was an obvious change in Hudson's demeanor." Hudson stated he did not like the video calls and did not feel safe with Brian. He had no desire to attend counseling with Brian.

¶ 68    Chase enjoyed living with his mother and did not have a positive outlook about Brian. He indicated that the video calls were awful and something that he dreaded. He had no desire to have a relationship with him.

¶ 69    Sharpe indicated that the parents could not work together to make decisions regarding the children, and he recommended that Lindsay have sole decision-making, as she had been making the decisions for the children. Regarding parenting time, Mr. Sharpe stated that he had considered all the best interest factors outlined in section 602.7 of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/602.7 (West 2020)) and discussed those factors that were most influential to him.

¶ 70    He stated that the wishes of the children were important to him in making his recommendation, as each child showed an ability to express reasoned and independent preferences. Still, he believed that only utilizing the children's wishes would "lead to no path toward" Brian having parenting time. Sharpe did not think it was in the children's best interests to leave their reality unchanged. He admitted that the children voiced a desire to avoid counseling with Brian, but they were unable to provide a reason beyond their belief that Brian would not change. Sharpe hoped that counseling would help everyone achieve a healthy relationship.

¶ 71    Sharpe viewed the video calls between the children and Brian and noted that they consisted primarily of Brian talking to the boys while the boys remained nonverbal. There were times when the boys would laugh or smirk at Brian, which made Brian angry. He noted that there were times

17

when Brian was "inappropriate with his language and discuss[ed] both the pending family and criminal litigation" which Mr. Sharpe found disappointing, as Brian knew he was being recorded. The calls revealed a fractured relationship between Brian and the boys, and Sharpe believed that a different arrangement was necessary for Brian to have a meaningful relationship with them.

¶ 72　Each parent had made allegations against the other involving mental health issues that affected the other's parenting ability. Sharpe indicated that "it is readily apparent that the parents had a toxic relationship and that their separation has been a benefit to everyone involved." Sharpe had no evidence to support Brian's claim that Lindsay's mental health was a detriment to her ability to parent the children, as they were doing well in her care.

¶ 73　Sharpe noted that the trial court had restricted Brian's parenting time, and he did not feel that the court erred in its judgment. No matter whose fault the June 2022 physical altercation was, "any instance in which a parent puts their hands on a child is an instance which should be taken seriously and this court has done exactly that." He stated that the video communication was not going well and that something needed to change. Sharpe did not believe that beginning in-person parenting time, even if supervised, would result in any meaningful interaction. He thought that a restriction on Brian's parenting time was appropriate until joint counseling could be completed.

¶ 74　Sharpe understood Lindsay's desire to restrict the children's access to Brian, but also did not believe that time was going to mend the wounds of this family. He recommended that Brian's parenting time be restricted until the reunification counseling was completed successfully. He suggested a counselor who was willing to meet with the children separately, Brian separately, and then craft an actionable plan moving forward for Brian to be in the same room with the children and the counselor. Sharpe hoped that this type of counseling would result in another plan moving forward to have normalized parenting time for Brian.

18

G. Trial Court's Ruling

¶ 76    On December 2, 2024, the trial court issued a written ruling. Concerning allocation of parental responsibilities, the court noted that it considered the factors outlined in section 602.5 of the Marriage Act (750 ILCS 5/602.5 (West 2020)) and found that seven of the outlined factors weighed in favor of Lindsay, thereby supporting its decision to award Lindsay the sole decision-making responsibilities for education, extracurricular, medical, and religious purposes. It noted that during their *in camera* interview, all three children adamantly expressed their wishes and preferences, favoring their mother. It also found that the children's mental health would best be served with Lindsay having sole decision-making responsibilities, in that the parties have had a complete breakdown in communication and had not spoken since June 2022. The trial court discussed that it viewed the June 2022 video and found that the factors concerning physical abuse weighed in favor of Lindsay. The trial court acknowledged that Lindsay does not want to facilitate a relationship with Brian. Still, it did not find this factor "sufficient enough of a negative factor to not award her sole decision-making responsibilities."

¶ 77    Regarding the allocation of parenting time, the trial court stated that it considered the 17 factors outlined in section 602.7 of the Marriage Act (*id.* § 602.7). It considered each of these factors, along with the testimony and evidence presented in court, and awarded Lindsay the majority of the parenting time. Brian was granted limited or restricted parenting time with the two boys and no parenting time with Madison. The court stated that while Lindsay placed all the blame on Brian regarding the breakdown of communication during the video calls, it found otherwise. The court was not provided with any additional evidence of aggression and violence other than the incident that occurred in June 2022. The court stated that it was relying heavily on the GAL report and found that it was in the best interests of the boys to develop a plan whereby Brian was

reintegrated into a better relationship with them. It ordered Lindsay to schedule counseling sessions for the two boys with a specified counselor who was to assist them in reintegrating their relationship with their father. The counseling was to terminate should the counselor determine that the joint sessions with Brian were detrimental to the health of the boys. Brian was ordered to complete anger management.

¶ 78    As to child support, the trial court acknowledged that Brian lost his "high paying employment" but that little evidence was presented as to whether this was a result of his own doing. The trial court ordered child support of $2,347 per month retroactive to July 22, 2022. It noted that a hearing on Brian's motion to modify child support was "to be set at a later date." Lindsay was awarded all three children for tax purposes.

¶ 79    Concerning maintenance, the trial court expressed that it was to consider the factors outlined in section 504 of the Marriage Act (*id.* § 504) and that it did, indeed, consider those factors. A review of those factors revealed that Lindsay was entitled to maintenance of $2,904.66 for 20 years.

¶ 80    The trial court ordered that the net proceeds from the sale of the marital residence be split evenly. It stated that Lindsay did not have an established pension and that after the separation, she obtained employment as a teacher and was "probably entitled to a pension through the Teachers' Retirement System." However, it had not received any evidence to that effect, but it would most likely be nominal. Lindsay was therefore awarded her TRS. Brian had four pensions, and the trial court awarded Lindsay 50% of the pensions from the date of marriage to the date of the judgment of dissolution of marriage. Brian had a 401(k) through John Hancock with a value of approximately $16,764.89. The trial court awarded each party 50% of that 401(k).

¶ 81    Concerning personal property, the trial court noted that the parties utilized numerous

20

demonstrative exhibits to assist in their presentation and that "the parties' testimonies were chaotic and difficult to follow." It stated that there was a dispute regarding which property was in Lindsay's possession and which property was left in the marital residence for Brian to retrieve before the house was sold. It indicated that it found it difficult to determine which party's testimony was accurate, but accepted Brian's testimony regarding what he did not have in his possession. It concluded, therefore, that the property must be in Lindsay's possession because she and the children "were exclusively in control of the marital home and exclusive control of the personal property for more the [*sic*] six months and by her own admission she removed the bulk of the property from the marital home." The trial court did not find Lindsay's testimony credible that she left personal property for Brian to retrieve. Based on a stipulated exhibit, the trial court determined the total value of the parties' personal property was $70,300. It found that Lindsay had approximately $11,332 worth of marital property and assessed $500 of value towards the personal property Brian had in his possession. The trial court found that each party was to retain the personal property in their possession "and each part[y] is assessed with $36,500 value (50%) of marital property." The trial court stated that Brian was to be credited $36,000 for property he did not have, and Lindsay was to be credited $25,178 for property she did not have.

¶ 82 Concerning marital debt, the trial court indicated that the parties had $70,134 in credit card debt and a LendingClub loan. Due to the substantial difference in the parties' incomes during the marriage when the credit cards were incurred, as well as the disparity in their earning potential, the trial court assigned 75% of the marital debt to Brian, amounting to $52,606.50. Lindsay was assigned 25% of the marital credit debt, totaling $17,533.50.

¶ 83 The trial court issued a lengthy decision about Brian's allegation of dissipation of assets. The trial court noted that at no time was Lindsay ordered to be solely responsible for the upkeep

21

of the home, including the pool. It acknowledged that Brian did not have access to the house for more than six months, but there was no agreement mandating that Lindsay use her own funds to maintain the pool. Lindsay testified that she attempted to close the pool, but Brian claimed she did not do it properly. The trial court stated that it was Brian's burden to prove that Lindsay's actions solely caused the waste, and that he did not satisfy this burden. More specifically, the trial court stated:

> "First, Husband failed to sufficiently prove Wife's alleged failure to close the pool properly was a contributing factor to the reduction to the sale price of the home. (All that was offered in this regard was solely Husband's testimony). Second, although Husband was ordered to pay temporary maintenance to Wife on [*sic*] he failed to pay her any maintenance until for some time period after the order. The court finds it disingenuous for Husband to claim Wife failed to maintain the marital home when he was not paying her the court ordered maintenance as well as he was not making the mortgage payments at a time when he was the larger income earner between the parties."

¶ 84 The trial court denied Brian's claim for dissipation of marital assets.

¶ 85 Regarding attorney fees, the trial court stated that both parties are to assume their own obligation towards the payment of their own attorney fees, except that he ordered Brian to pay Lindsay $5,000 as payment for her attorney fees.

¶ 86 In its final distribution of assets and debts, the trial court listed the assets and debts, along with its assignment thereof to the parties, and issued a total net award of marital assets in the amounts of $5,806.86 to Brian and $39,057.86 to Lindsay. As a result, the trial court ruled that Lindsay was entitled to receive the balance of the funds from the sale of the home, in the amount of $36,061.81, and that Brian was to retain his 401(k) account. Brian was also ordered to pay Lindsay an additional $2,996.05.

¶ 87 On December 4, 2024, the trial court's ruling was incorporated into a judgment of dissolution of marriage. On December 31, 2024, Brian timely filed a *pro se* notice of appeal.

22

¶ 88                                    II. ANALYSIS

¶ 89    Brian is appealing certain aspects of (1) the parenting time order, (2) the allocation of assets

and debt, and (3) the imposition of child support and maintenance. At the outset, we note that in

the argument portion of his brief, Brian lists sub-issues concerning each contention on appeal.

However, the arguments for each of the three major contentions do not provide detailed reasoning

or even acknowledge all his listed sub-issues. He provides arguments for only a few sub-issues,

without further discussing others. With that said, we will only address those sub-issues for which

he offered an argument, as Illinois Supreme Court Rule 341(h)(7) requires that arguments "shall

contain the contentions of the appellant and the reasons therefor, with citation of the authorities

and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). "A court of review

is entitled to have the issues clearly defined and to be cited to pertinent authority. [Citation.] The

appellate court is not a depository in which the appellant may drop the burden of argument and

research. [Citation.] Arguments which do not satisfy the requirements of Supreme Court Rule

341(e)(7) do not merit consideration on appeal. [Citation.]" *In re Marriage of Winton*, 216 Ill. App.

3d 1084, 1090 (1991). Accordingly, we deem those sub-issues not supported by argument

forfeited.

¶ 90                               A. Parenting Time

¶ 91    Brian's first contention regards the trial court's analysis of parenting time. Section 602.7

of the Marriage Act provides "[t]he court shall allocate parenting time according to the child's best

interests." 750 ILCS 5/602.7(a) (West 2020). "In determining the child's best interests for purposes

of allocating parenting time, the court shall consider all relevant factors." *Id.* § 602.7(b). The

relevant factors for the court to consider include, but are not limited to, the following:

        "(1) the wishes of each parent seeking parenting time;

23

(2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;

(3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities ***;

(4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the exact nature of the offense and what if any treatment the offender has successfully participated in; the parties are entitled to a hearing on the issues raised in this paragraph (15);

(16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and

(17) any other factor that the court expressly finds to be relevant." *Id.* § 602.7(b)(1)-(17).

¶ 92    " '[T]he best interests of the child is the "guiding star" by which all matters affecting children must be decided.' " *Smith v. Small*, 2022 IL App (4th) 220057-U, ¶ 40 (quoting *In re Parentage of J.W.*, 2013 IL 114817, ¶ 41). " 'A trial court's findings as to a child's best interest are entitled to great deference because the trial judge is in a better position than we are to observe the personalities and temperaments of the parties and assess the credibility of the witnesses.' " *Id.* (quoting *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 21). We will not reverse a

24

trial court's best-interest determination unless it is against the manifest weight of the evidence. *Id.* " 'A decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence.' " *Id.* (quoting *In re Marriage of Bhati*, 397 Ill. App. 3d 53, 61 (2009)).

¶ 93    Brian argues extensively in his brief and reply brief that the trial court failed to consider parental alienation on the part of Lindsay. We find this contention unpersuasive. First, the factors the trial court is to consider are listed in section 602.7, and parental alienation is not included among them. The trial court was not required or mandated to consider any alleged parental alienation. Second, although the trial court did not use the term "parental alienation," it did consider whether Lindsay influenced the boys' negative feelings. The trial court specifically mentioned that it considered Lindsay's reluctance to facilitate a relationship between Brian and the boys. Although the trial court did not go so far as to label her actions as "parental alienation," its analysis reveals that it thoroughly examined Lindsay's situation of solely having the children for an extended period and determined that it had no significant impact on the boys' feelings towards Brian. The trial court stated that the boys' "deep-seeded hatred and dislike towards their father" was due to Brian's treatment of Madison. It also found that Lindsay did not want to facilitate a relationship between the children and Brian, but that it did not consider this a significant factor. In other words, the trial court carefully considered and analyzed why the boys despised their father and determined, based on all the evidence, testimony, and videos, that it was primarily a result of Brian's actions towards Madison, rather than any other factor.

¶ 94    Brian argues that the trial court "failed to adequately consider the father's right to parent his children." Again, this is not a mandated factor specified in section 602.7, and he has not

provided us with any authority indicating that a trial court must include this as a factor of best interest.

¶ 95 He contends that he "demonstrated an ongoing willingness to remain an active part of his children's lives" and that this willingness should have been given more weight in the trial court's analysis of parenting time. However, the testimony at trial contradicts Brian's perspective. More specifically, despite Brian's entitlement to two video calls per week with the boys, as of the August trial date, he had not participated in any video calls since April 2024, missing at least three months of Zoom calls. The boys would log on to Zoom and wait for him to appear, and he never did. This does not in any way support his contention that he has demonstrated an ongoing willingness to remain active with his children.

¶ 96 Here, the trial court weighed the testimony and determined that providing Lindsay a majority of the parenting time was in the children's best interests. The trial court conducted an *in camera* interview with the children, providing a glimpse into their lives with Brian before the June 2022 incident. All the children discussed the anger issues he demonstrated throughout their lives, and some physical altercations he instigated against them. The children's discussion with the trial court was consistent with their conversations with the GAL, which occurred approximately six months apart. The consistency in their statements to two separate individuals months apart supports the veracity of their observations.

¶ 97 Additionally, the video of the June 2022 incident supported the trial court's allocation of parenting time. The video demonstrates that, at least twice, Madison attempted to diffuse the situation by stepping away from Brian and putting distance between the two. However, Brian continued to attack, and at one point, appeared to be choking her with his forearm. In addition to the June 2022 incident, the boys indicated that they suffered from the violence and anger of Brian

26

in the past. All three children further testified to the trial court that Brian's social media posts were extremely bothersome and that they would get teased about them at school. The evidence demonstrated that Brian's behavior negatively impacted the children.

¶ 98   In the alternative, no evidence was presented that Lindsay has negatively impacted the children. All three children testified *in camera* that she was there when the children need her and that she provided for them. After Brian left, Lindsay obtained employment and tried to provide for the children. Further, the GAL recommended that the trial court award Lindsay all the parenting time.

¶ 99   The trial court also ordered reunification counseling between Brian and the boys in an effort to facilitate a relationship between Brian and his children. Awarding Lindsay sole parenting time while formulating a plan for reunification between the boys and Brian was in line with the best interest factors and not against the manifest weight of the evidence. The trial court heard days of testimony, was very familiar with these parties, and was in the best position to assess their demeanor and credibility. The outcome reached by the trial court was not unreasonable or arbitrary and was fully supported by the testimony it heard. Thus, we do not find its parenting time allocation to be against the manifest weight of the evidence.

¶ 100                    B. Division of Assets and Debts

¶ 101   Brian argues that the trial court erred in its division of marital assets and debts. Section 503(d) of the Marriage Act provides that, in a dissolution proceeding, the court shall divide the parties' marital property in just proportions, considering all relevant factors. 750 ILCS 5/503(d) (West 2020). Those relevant factors include the following:

> "(1) each party's contribution to the marital estate;
> (2) the dissipation of marital assets by either party;
> (3) the value of the property assigned to the spouse;
> (4) the duration of the marriage;

27

(5) the relevant economic circumstances of each spouse when the division of the property is to become effective;

(6) any obligations and rights arising from a prior marriage of either party;

(7) any antenuptial agreement of the parties;

(8) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties;

(9) the custodial provisions for any children;

(10) whether the apportionment is in lieu of maintenance;

(11) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and

(12) the tax consequences of the property division upon the respective economic circumstances of the parties." *Id.*

¶ 102    "[A] trial court has broad discretion in the valuation and subsequent distribution of marital assets." *Kew v. Kew*, 198 Ill. App. 3d 61, 65 (1990). A trial court's distribution of marital property will not be reversed, absent a showing that the court abused its discretion. *In re Marriage of Sanfratello*, 393 Ill. App. 3d 641, 648 (2009). "A trial court abuses its discretion only where its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *In re Marriage of Klose*, 2023 IL App (1st) 192253, ¶ 31.

¶ 103    Brian first contends that the trial court erred in not awarding him one-half of Lindsay's 401(k),[2] arguing that this "resulted in a highly inequitable distribution of retirement assets." We agree to a point. Brian was employed throughout the party's marriage and on numerous occasions reminded the trial court that he was the one who provided for the family's standard of living. Since this is true, he is also the sole party that was able to obtain and contribute to a retirement for the parties while Lindsay maintained the house and the children. Stated differently, Lindsay's efforts at home afforded Brian the ability and freedom to build his career, ultimately leading to a retirement that would benefit both parties. Unfortunately, the parties are no longer able to share

---

[2]We point out that Lindsay did not have a 401(k), but only a pension through TRS. Therefore, we will address his point as to her TRS.

28

the retirement accumulation that resulted from their combined efforts as a couple. For Brian and Lindsay to separately appreciate their joint efforts regarding the pensions, they must be split evenly between the two. This is precisely what the trial court did. It awarded Lindsay one-half of Brian's four pensions and his 401(k).

¶ 104   Regarding Lindsay's pension through TRS, which is approximately $3,000, we agree that Brian should be awarded his marital share of Lindsay's TRS. "The division of pension benefits is an allocation of property in which each spouse has a species of common ownership." 750 ILCS 5/503(b)(2) (West 2020). The trial court's decision not to award Brian the small portion of Lindsay's TRS pension was an abuse of discretion.

¶ 105   Brian argues that Lindsay failed to "disclose her new home, which she obtained in September 2022." This argument is baseless as there was no evidence that Lindsay purchased a new home in September 2022. Instead, she testified that her parents bought the house in September 2022, and that she and the children reside in the home, for which she pays $2,000 per month in rent. Brian failed to provide any evidence during the trial to support his allegation that Lindsay purchased the home instead of her parents, and we will not address his argument further.

¶ 106   Brian contends that the trial court erred when it valued the assets at $70,300. This argument completely lacks merit, as he testified twice that it was his opinion that the marital personal property was valued at $70,340. Additionally, the parties submitted a stipulated exhibit, drafted by Brian's counsel, regarding personal property, and Brian testified that this exhibit indicated the total value of marital personal property was $70,340. It is disingenuous for Brian to now argue that the trial court erred in its valuation of the property.

¶ 107   Brian asserts that because he contributed a majority to the acquisition of the assets, he is entitled to more than the 50% allocation thereof. Under section 503(d), a spouse's financial

29

contribution to the acquisition of marital property is only one of several factors the trial court considers when fashioning an equitable distribution of marital assets. *In re Marriage of Johns*, 311 Ill. App. 3d 699, 704 (2000). "[A]lthough a party's greater financial contribution may support a disproportionate property award in favor of the contributing spouse [citations], 'a spouse's greater financial contributions do not necessarily entitle him or her to a greater share of the marital assets' [citation]. Indeed, '[i]n a long-term marriage, the source of the assets in acquiring marital property becomes less of a factor, and a spouse's role as homemaker becomes greater.' [Citation.]" (Internal quotation marks omitted.) *In re Marriage of Polsky*, 387 Ill. App. 3d 126, 136 (2008). The outcome of each case is determined by its facts. *Id*.

¶ 108    Here, a similar analysis applies. While Brian contributed assets to the marriage, Lindsay stayed home with the three children, ensuring they attended their numerous sporting events and practices, while also managing the household. The parties were married for 20 years, and the fact that all three children continue to rely on her after Brian left further supports the notion that she has added and continues to add value to the family. While Brian's hard work during the marriage to accumulate such vast assets should be credited, so too should Lindsay's sacrifices that allowed him to do so. Property distribution requires an equitable distribution, not an equal one. *In re Marriage of Foster*, 2014 IL App (1st) 123078, ¶ 103. Thus, the trial court's division of assets in this case was equitable and not an abuse of discretion.

¶ 109    Brian next argues that the trial court erred in giving him 75% of the debt and only 25% to Lindsay, claiming that Lindsay had a higher earning potential than he did and that she had a higher income at the time of the judgment of dissolution than he did. "It is well settled that marital debts as well as marital assets must be distributed equitably." *In re Marriage of Lees*, 224 Ill. App. 3d 691, 693 (1992). In this matter, the trial court divided the marital debt based on Brian's substantial

30

earning capacity during the marriage when the debt was created, and not the earning capacity of the parties at the time of judgment. The parties relied on Brian's income when incurring the debt, and consequently, it is just, fair, and equitable that Brian be held responsible for a majority of said debt. Additionally, the trial court pointed out that Brian has a greater earning capacity. Brian testified how he worked his way up through positions to reach the multi-state managerial job that he eventually held. The experience he gained throughout the decades of work that led to his final position, before his termination, is valuable and will undoubtedly lead him to another lucrative career. Lindsay, on the other hand, has a lower earning capacity as an elementary school teacher. Thus, the trial court's apportionment of 75% of the marital debt to Brian was not an abuse of discretion.

¶ 110                                C. Dissipation Claim

¶ 111   Brian next contends the trial court erred in failing to find that Lindsay dissipated assets by failing to close the pool properly. Dissipation means the " 'use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time that the marriage is undergoing an irreconcilable breakdown.' " *In re Marriage of Schneeweis*, 2016 IL App (2d) 140147, ¶ 33 (quoting *In re Marriage of O'Neill*, 138 Ill. 2d 487, 497 (1990)). Here, Brian claims that Lindsay dissipated the marital residence by failing to close the pool at the end of the season properly. In other words, he maintains that her actions dissipated the value of the home. It is the role of the trial court to determine whether dissipation has occurred, and we will not disturb its factual findings in that respect unless they are against the manifest weight of the evidence. *In re Marriage of Holthaus*, 387 Ill. App. 3d 367, 374 (2008).

¶ 112   Here, the trial court spent an extensive amount of time considering Brian's claim, as is evidenced by its lengthy ruling on the subject. After summarizing the evidence adduced during the

31

numerous days of trial, the trial court stated that it does not "accept" Brian's claim that Lindsay dissipated the marital residence by not closing the pool properly. First, the trial court noted that Lindsay was never ordered to be responsible for the upkeep of the home, including the pool. It acknowledged that Brian did not have access to the house for approximately six months, but it pointed out that Lindsay did not have the funds to maintain, let alone close the pool. During that period, Brian was ordered to pay temporary maintenance, but he failed to do so. Lindsay was relying on income from her new teaching position at a local elementary school, as well as child support, to maintain the home, pay the utilities, and provide for the children. She did not have the resources readily available to spend on extras such as hiring someone to close the pool. Second, Brian failed to prove that Lindsay dissipated the marital residence. "The complaining spouse must make a *prima facie* case for dissipation \*\*\*." *In re Marriage of Budorick*, 2020 IL App (1st) 190994, ¶ 88. Here, the only evidence presented was Brian's opinion that the reduction in the price of the sale of the marital residence by $50,000 was a direct result of Lindsay's inaction in maintaining the pool and other areas of the home. However, aside from his testimony, Brian did not provide any additional evidence to corroborate his claim. While this is not a standard claim of dissipation, we still agree with the trial court that Brian did not meet his burden of proving that Lindsay dissipated the marital residence. Therefore, we affirm its denial of the dissipation claim.

¶ 113                    D. Child Support and Maintenance

¶ 114 Brian's final argument concerns the trial court's allocation of child support and maintenance. Section 505 of the Marriage Act (750 ILCS 5/505 (West 2020)) governs child support. Section 505(a) provides that the trial court may order either or both parents owing a duty of support to pay an amount that is "reasonable and necessary" for support. *Id.* § 505(a). The duty of support includes the obligation to provide for the reasonable and necessary physical, mental,

and emotional health needs of the child. *Id.* The trial court has the discretion to determine the appropriate amount of child support, and we will not reverse that determination absent an abuse of discretion. *In re Marriage of Gabriel*, 2020 IL App (1st) 182710, ¶ 56.

¶ 115   Brian contends that the trial court utilized inaccurate figures and did not take into account his financial affidavit. This claim is unsupported by the record. On September 14, 2022, the trial court informed the parties that it would calculate temporary child support on a summary basis. It provided Lindsay time to file child support calculations, and Brian was given 14 days thereafter to object. On September 15, 2022, Lindsay filed her child support calculations. The figure she utilized for Brian's gross monthly income ($14,055.64) was derived directly from Brian's financial affidavit. Thereafter, Brian filed an objection, but only as to the imposition of maintenance. He neither mentioned nor objected to the salary figure Lindsay used to calculate child support, nor did he object to the calculated child support amount. Thereafter, the trial court noted that Brian did not object to the "parties' incomes as stated in the mother's worksheet" and consequently used those figures to calculate child support, resulting in the trial court's calculation of temporary child support of $2,347 per month. It is this figure that the trial court adopted for the final judgment. The trial court obtained Brian's gross monthly income from Lindsay's filed calculations, who in turn had obtained Brian's gross monthly income from Brian's financial affidavit. His argument that "[t]he court's failure to properly consider the father's income is a violation of this statute" is baseless, as the trial court utilized Brian's income as stated on his financial affidavit.

¶ 116   Brian next argues that the trial court erred in awarding maintenance for 20 years and for failing to take into consideration his "changed financial circumstances." Section 504(a) of the Marriage Act (750 ILCS 5/504(a) (West 2020)) outlines factors for a trial court to consider when

determining whether to award maintenance. "The court shall first make a finding as to whether a maintenance award is appropriate, after consideration of all relevant factors, including:

> (1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage;
> (2) the needs of each party;
> (3) the realistic present and future earning capacity of each party;
> (4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;
> (5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;
> (6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;
> (6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment;
> (7) the standard of living established during the marriage;
> (8) the duration of the marriage;
> (9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;
> (10) all sources of public and private income including, without limitation, disability and retirement income;
> (11) the tax consequences to each party;
> (12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;
> (13) any valid agreement of the parties; and
> (14) any other factor that the court expressly finds to be just and equitable." *Id*.

¶ 117 A trial court's decision to award maintenance is presumed to be correct. *In re Marriage of Nord*, 402 Ill. App. 3d 288, 292 (2010). A maintenance award is generally reviewed for an abuse of discretion. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 24.

¶ 118 Concerning Brian's assertion that the award of maintenance for 20 years was incorrect when the parties had only been married 18 years is without merit. The parties were married on September 4, 2004, and the judgment of dissolution of marriage was entered on December 4, 2024. Section 504 defines the length of time for an award of maintenance based on the duration of the marriage. In this case, the parties had been married for over 20 years. According to section 504,

34

the trial court has discretion, when the parties have been married for 20 or more years, to order maintenance for that amount of time or for an indefinite amount of time. In this matter, the trial court ordered permanent maintenance payable for a period of 20 years. "Permanent maintenance may be warranted in a lengthy marriage where the recipient spouse devoted his or her time to raise the children." *In re Marriage of Churchill*, 2019 IL App (3d) 180208, ¶ 26. Further, "permanent maintenance may be more appropriate when the receiving spouse is not employable or is employable only at a low income when compared to the standard of living enjoyed during the marriage." *In re Marriage of Harlow*, 251 Ill. App. 3d 152, 159 (1993). The testimony was unrefuted that throughout the marriage, Lindsay stayed home and raised the children while Brian traveled for work. Furthermore, after Brian left, Lindsay obtained employment as a teacher; however, her salary was not commensurate with the lifestyle she and the children had enjoyed.

¶ 119   Several statutorily prescribed factors justify an award of permanent maintenance. The parties were married for a lengthy 20 years. See 750 ILCS 5/504(a)(8) (West 2020). The parties' future earning capacities are incredibly disparate. See *id.* § 504(a)(3). Lindsay's standard of living since the separation is substantially lower than that enjoyed during the marriage. See *id.* § 504(a)(7). Although Lindsay obtained employment after the separation, she did not work during the marriage to raise the children. See *id.* § 504(a)(4). " 'There is no question but that Illinois courts give consideration to a more permanent award of maintenance to wives who have undertaken to *** raise and support the family ***.' " *In re Marriage of Drury*, 317 Ill. App. 3d 201, 206 (2000) (quoting *In re Marriage of Rubinstein*, 145 Ill. App. 3d 31, 40 (1986)). An analysis of the statutory factors weighs in favor of Lindsay. We conclude the trial court properly exercised its discretion in awarding permanent maintenance.

¶ 120 Brian additionally argues that the trial court failed to take into consideration his changed financial situation in that he lost his high-paying job due to "excessive missed travel days and lack of funds." However, he fails to acknowledge the letter from his employer that he attached to his own petition to modify, filed on July 15, 2024, which addressed the reason for his termination. More specifically, it states:

> "As you are aware, you previously met with Chief of Staff John Downey and Director of Field Organizers Rich Bonzani on May 3, 2024, to discuss your subpar work performance, at which time you were advised that your performance as an Organizer was far below the IUOE's acceptable standards. You were also given clear directives and instructions about the specific areas in which you needed to show significant improvement. Since that meeting, however, you have not demonstrated the ability to improve your work performance, or to maintain it at a consistently acceptable level. Accordingly, I regret to inform you that your employment with the IUOE will terminate at the close of business on Wednesday, July 10, 2024."

¶ 121 The trial court, after being afforded the lengthy opportunity to observe the demeanor and character of the parties, believed that Brian caused his circumstances, and he cannot use them now as an excuse to avoid paying maintenance. Furthermore, Brian is a combat veteran with many skills and presented no valid reason as to why he cannot be gainfully employed. The trial court noted that it examined the statutory factors in arriving at its decision to award permanent maintenance, and we do not find that its analysis was flawed or that it abused its discretion.

¶ 122                                    III. CONCLUSION

¶ 123 For the foregoing reasons, we reverse the trial court's order granting Lindsay 100% of her TRS pension, and find that Brian is entitled to his marital share of said pension. In all other respects regarding the trial court's order, we affirm.

¶ 124 Affirmed in part and reversed in part; cause remanded.